Linda A. COPELAND, f/k/a Linda A. Anderson, Appellant,

v.

Robert E. ANDERSON, Appellee.

No. 61067.

Court of Appeals of Oklahoma, Division No. 4.

Sept. 24, 1985.

Released for Publication by Order of the Court of Appeals Oct. 18, 1985.

Thomas S. Bala, Walter R. Gaidaroff, Robert Leyton Wheeler, Inc., Oklahoma City, for appellant.

Andy M. Coats, Kelley C. Callahan, Crowe & Dunlevy, Oklahoma City, for appellee.

BRIGHTMIRE, Presiding Judge.

Does civil liability for the tort of perjury exist in this state? This is the foremost question which arises from the sustention of a demurrer to plaintiff's cause of action for perjury and pretrial deceit. A procedural problem concerning our jurisdiction to review will be preliminarily disposed of sua sponte. We hold that civil liability for the tort of perjury does lie in this state but that plaintiff has not factually pleaded the essential elements of such a cause of action.

I

The parties were divorced October 19, 1981. The decree awarded Linda A. Anderson, now Copeland, custody of two minor children, child support, alimony and a share of the marital estate. It was not appealed. On March 12, 1982, Mrs. Anderson filed a petition in the divorce case to vacate the decree on the ground the adjudication was obtained as a result of fraud on the part of her former husband, Robert E. Anderson, in concealing certain negotiations with his employer, McDonald's hamburger chain, which "had a direct relationship to the earning capacity of [Anderson]." [1]

While that petition was pending, Mrs. Anderson filed this action on March 7, 1983, charging her former husband with having concealed from plaintiff that arrangements were underway at the time of trial for "granting of a [McDonald's] store to defendant," and with having "falsely denied to the court [during divorce proceedings] that he had any plans to acquire an interest in a store by way of joint venture or by way of a business facility lease with an option to buy," and that such concealment caused plaintiff to be awarded far less than she would have been awarded had Mr. Anderson's "true earning capacity" been disclosed, all to her damage of at least $150,000. She also asked for $500,000 punitive damages because of the alleged

fraud and deceit practiced by Mr. Anderson. In other words, plaintiff is seeking to recover damages resulting from her former husband's deceit before and his alleged perjury during the divorce trial.

In the fullness of time, Mrs. Anderson filed a second amended petition in this case which was divided into what she called three causes of action. Each consisted of substantially the same factual allegations and each sought essentially the same ultimate relief. The first "cause" was for damages said to have resulted from defendant's perjury and deceit. One change was in the substitution of the word "endeavors" for the word "plans" in referring to what defendant had concealed and falsely denied in court. The second "cause" asked for vacation of the divorce decree, presumably so she could once more try to get an additional $150,000 from defendant. The third "cause" requested the court to modify the decree and give her "an additional award of property, or alimony in lieu of property in the amount of $150,000.00."

On August 19, 1983, the trial court sustained defendant's demurrer to plaintiff's action for damages in her last petition after concluding that the facts she stated would not entitle her to the requested relief.[2] Plaintiff appeals the ruling contending her petition does state a cause of action.

II

At the outset we take up the jurisdictional question concerning the validity of this appeal—whether it is taken from an appealable order.

Ostensibly the appeal is from an order sustaining a demurrer to only one of three causes of action. Since one cannot appeal from sustention of a demurrer to one of several causes unless the question is certified by the trial court—which was not done here—we face the prospect of having to conclude that the order appealed is not a

1. The record does not show a disposition of this petition to vacate the divorce decree.

2. Demurrers to the second and third causes set out in the first amended petition had been over-

ruled. They were not specifically challenged in the second amended petition except by the one demurrer referred to in Part II.

final and appealable one and dismiss the appeal as prematurely brought. *LaVelle v. Fair Oil Company*, 388 P.2d 13 (Okl.1963); *Fowler v. City of Seminole*, 196 Okl. 167, 163 P.2d 526 (1945). An analysis of the petition, however, convinces us that the demurrer should not be treated as addressing only a part of the petition but all of it because in our opinion plaintiff has pleaded but one cause of action and seeks a single relief objective—compensation—based on a single set of operative facts. It is in effect a general demurrer. The rule with regard to such a demurrer is that if a petition states any "facts" entitling the pleader to relief it should be overruled. *Romney v. Davis*, 208 Okl. 81, 253 P.2d 546 (1953). Of course the flip side of this legal coin is that if the petition states insufficient facts for any relief a general demurrer must be sustained. Under these circumstances, then, the order appealed should be considered as having disposed of the entire petition and is therefore a final one which vests in us jurisdiction to decide the issue raised.

### III

■ The first substantive question to decide is without precedent in this state and is whether our law permits recovery of damages in a civil action for testimonial perjury. If it does, then a secondary question arises, of course, and that is whether the facts plaintiff has pled state such a cause of action.

### A.

With regard to the first question, we conclude that our state constitution and statutes do authorize such an action.

Prefatorily it might be helpful to note that perjury is a crime in this state and statutorily defined as the willful "making or subscribing" of a false statement under oath, "in a trial, hearing, investigation, deposition, certification or declaration." [3] Perjury is also a civil wrong within the purview of Article 2, § 6 of our state constitution,[4] and our statutory law. *See, e.g.*, 76 O.S.1981 §§ 1, 2 and 5(a).[5]

Actionable perjury is a form of the tort of deceit. To create liability there must be proof that the perjurious statement consisted of a deceit as defined in the first three paragraphs of 76 O.S.1981 § 3,[6] which, to

---

**3.** 21 O.S.1981 § 491, reads:

"Whoever, in a trial, hearing, investigation, deposition, certification or declaration, in which the making or subscribing of a statement is required or authorized by law, makes or subscribes a statement under oath, affirmation or other legally binding assertion that the statement is true, when in fact the witness or declarant does not believe that the statement is true or knows that it is not true or intends thereby to avoid or obstruct the ascertainment of the truth, is guilty of perjury. It shall be a defense to the charge of perjury as defined in this section that the statement is true."

and 21 O.S.1981 § 492, defines oath as follows:

"The term 'oath,' as used in the last section, includes an affirmation, and every other mode of attesting the truth of that which is stated, which is authorized by law." (Footnote omitted.)

**4.** This provision reads:

"The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for *every wrong* and for *every injury* to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice." (Emphasis added.)

**5.** Section 1 says:

"Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."

Section 2 provides:

"One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

Section 5(a) reads in pertinent part:

"(a) Everyone is responsible ... for the result of his willful acts [if] injury [is] occasioned to another...."

**6.** Section 3 reads in relevant part:

"A deceit, within the meaning of the last section, is either:

1. The suggestion, as a fact, of that which is not true by one who does not believe it to be true.

2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true.

3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact...." (Footnote omitted.)

use the language of the statute, "willfully deceives another," e.g. a litigant, a juror, or an investigator, with intent to induce him to alter his position to his or another's injury or risk. In the case of trial testimony, for instance, the proof must show a litigant suffered detriment as a result of deception practiced on the trier of fact by the witness.[7] And, if such detriment is shown, the damaged party is entitled to be compensated for it by the tortfeasor.[8]

Ironically, after this country achieved independence, American courts tended to rely on English common law for precedential guidance in areas not covered by statute. Thus with regard to the tort of perjury it is not surprising that early decisions in this country unquestioningly followed a sixteenth century English decision which denied plaintiff the right to recover compensatory damages for the tort of perjury.[9] In at least one state, however, the action is allowed by statute.[10] And in New York recovery may be had in a civil action for treble damages against any attorney or counselor "who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party." [11]

One can hardly help wondering how the English jurists came up with their no action idea in the first place. A satisfactory answer requires an exploration of the dark and slippery caverns of Anglo-Saxon jurisprudence as its evolutionary development gave birth to existing decisional law of perjury. It also requires recognition of the fact that the first decision came at a time when the English fact finding process was undergoing vast changes and only lately had emerged from a feudalistic social structure which had begun with the Norman Conquest in 1066—a process that featured trial by ordeal (abolished by a church council in 1215), determination of facts by "wager of battle," the judicial duel (not officially abolished until 1819 when the unused law was invoked by an ingenious defendant!), "wager of law," and juries composed of "witnesses" to the facts.[12]

Two early conceptual issues over which a major word war was waged by opposing groups of late medieval legal scholars and judges alike were: (1) whether there was a common law crime of perjury before enactment of the so-called Perjury Statute of 1563 (5 Eliz. c. 9), and (2) whether this statute was a declaratory one, that is, a codification of a preexisting common law crime of perjury, or an "innovative" one introducing a new procedure, remedy or crime. We shall not linger on such complex historical details except to observe the

---

7. 76 O.S.1981 § 4, provides:

"One who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit."

In other words, with regard to ·deceptive trial testimony given with the intention of influencing the jury's verdict, the deceiver is deemed to have intended to defraud the litigant who is adversely affected by such verdict.

8. 23 O.S.1981 § 3, reads:

"Any person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages."

9. *See, e.g., Page v. Camp,* Kirby 7 (Conn.1786); *Kessler v. Townsley,* 132 Fla. 744, 182 So. 232 (1938); *Ruehl Bros. Brewing Co. v. Atlas Brewing Co.,* 187 Ill.App. 392 (1914); *Grove v. Brandenburg,* 7 Blackf. 234 (Ind.1844); *Curtis v. Fairbanks,* 6 N.H. 542 (1845); *Kietrys v. Cregar,* 23

N.J.Misc. 273, 43 A.2d 810 (1945); *Ginsburg v. Halpern,* 383 Pa. 178, 118 A.2d 201 (1955); *Cunningham v. Brown,* 18 Vt. 123 (1846); *Platts, Inc. v. Platts,* 73 Wash.2d 434, 438 P.2d 867 (1968).

10. Maine Rev.Stat. Ann. tit. 14, § 870 (1964). It states:

"When a judgment has been obtained against a party by the perjury of a witness introduced at the trial by the adverse party, the injured party may, within 3 years after such judgment or after final disposition of any motion for relief from the judgment, bring an action against such adverse party, or any perjured witness or confederate in the perjury, to recover the damages sustained by him by reason of such perjury; and the judgment in the former action is no bar thereto."

11. N.Y.Jud. Law § 487 (McKinney 1968).

12. W. Hall & R. Albion, *A History of England and the British Empire* 100–03 (2d ed.1946).

impact of a case that arose three years after the enactment of the Perjury Statute, when a person named Onslowe was charged with having committed perjury in the King's Bench Court.[13] The *Onslowe* court concluded in effect that the Perjury Statute was innovative, that is, it created a new crime of perjury and since there never was a common law crime of perjury, the Court of Star Chamber was without jurisdiction to hear a perjury case.[14] The conclusion that the Perjury Statute was innovative was contrary to the explicit language of the statute's preamble and it was probably for this reason the Star Chamber appears to have ignored the *Onslowe's Case* pronouncement.

The decision was also attacked on another front. Lord Chief Justice Coke—who maintained that perjury was a common law crime before passage of the 1563 Elizabethan statute—and his allies open fired on the *Onslowe's Case* by publishing an incendiary condemnation of it as being a product of "gross ignorance," the fruit of men "that never read the books at large."[15] Returning the fire two centuries later was a furious Lord Stephen who approved the *Onslowe's Case* reasoning. He counter-attacked with an explosive publication in which he rebuked Coke and assaulted his arguments as having been developed "in a cursory and unintelligent way," adding caustically, that "Coke's account of the law of perjury is a good illustration of the unintelligent patchwork way in which he writes on all subjects!"[16]

It may well be asked at this point what *Onslowe's Case* has to do with the issue we are concerned with here—civil redress for perjury. The answer is, as Gordon points out, that the confusion bred by both the 1563 Perjury Statute and its restrictive interpretation in *Onslowe's Case* were major factors in the decisions reached later in an English case, the roots of which eventually reached our shores and grew into the traditional American rule that an action for damages resulting from perjury is not available to the injured party.[17]

That case is *Damport v. Sympson.*[18] It was an action by Damport against Sympson alleging that the latter lied in a case Damport had filed against one J.D. The facts of the first case were that Damport delivered a silver fountain worth 500 £. to J.D., who agreed to ship it overseas, sell it, and account for the proceeds. Instead, J.D. took possession of the fountain, broke it, and converted the silver, thus precipitating a lawsuit for its value, 500 £. During a jury trial of that case, Damport alleged, J.D. produced a witness, Sympson, who falsely testified that the fountain was worth only 180 £. when in fact he knew it was worth 500 £. And, as a result of this perjury, the jury awarded him only 200 £. Damport alleged consequential damage in the amount of 300 £. The jury returned a verdict against Sympson for 300 £., who appealed contending such action could not be maintained because "until the statute of 3 Hen. 7. c. 1.... there was not any punishment for any false oath of any witness

**13.** Gordon, *The Invention of a Common Law Crime: Perjury and the Elizabethan Courts,* 24 Am.J. Legal Hist. 145, 147 (1980). The case referred to is *Onslowe's Case,* Dyer 242 (7 & 8 Eliz.).

**14.** *Onslowe's Case,* Dyer 242 (7 & 8 Eliz.). This holding was based on two fundamental legal conclusions: (1) there was no common law crime of perjury, and (2) there was no statutory vestment of such jurisdiction.

**15.** Gordon, *supra* note 13, at 147 (citing *Attorney General v. Miles,* J. Hawarde, *Les Reportes del Cases in Camera Stellata* 301 (W.P. Baildon ed. 1894) (1606)). We have taken the liberty of modernizing the quoted language. The original

reads this way: "Koke, Ch. Justice del Commonplace, replyed bitterlye, marueylinge to heare suche grosse ignoraunce, fruites of abredgemente men that neuer read the bookes at large." *Id.*

**16.** *Id.* at 149 (citing 3 J.F. Stephen, *A History of the Criminal Law of England* 248 (1883)). For those who would pursue this subject further we recommend Gordon's article. The author is to be commended for pulling together considerable material on such a narrow subject and weaving it into a lengthy and interesting piece.

**17.** *See id.* at 156–57.

**18.** Croke Eliz. 520, No. 8.

at the common law" but "now there is a form of punishment for perjury provided by the statute of 5 Eliz. c. 9; and if this action should be allowed, *the defendant might be twice punished,* viz. by the statute, and by this action, which is not reasonable." [19]   A divided court agreed with Sympson's rationale saying further that they could find no precedent for the action and if allowed, every witness would be sued, the intent of the jury could become an issue and all witnesses "would be terrified to speak the truth!" [20]

The seed of this case eventually reached and was sown on our side of the Atlantic. It germinated.  The few courts passing on the question in this country have resorted to similar legal fictions and assorted speculative, if not specious, reasons.  And while on occasion our courts have added a reason of their own to justify denial of a victim of perjury his right to redress, few if any have considered relevant state constitutional and statutory provisions or analogous decisional law contrary to the English view. A North Carolina court, for instance, denied an aggrieved party such redress because (1) witnesses who commit perjury are indictable; and (2) witnesses "would be intimidated if ... subjected to ... being sued by any party to the action to whom their testimony might not be agreeable." [21] Such double punishment theory, however, has never been accepted in this state as a basis for denying civil redress for assault, battery, arson, libel, slander, embezzlement, deceit, and other torts which are also crimes.

"It can readily be seen," wrote an Ohio court, "that if an action can be maintained against witnesses on account of pertinent statements made by them upon the trial of causes in court, how very much the administration of justice would be hampered and what a drag there would be upon the testimony of witnesses.  If ... witnesses ... could be subjected to an action of damages, how loath they would be to testify at all, and *what a great temptation there might be in many cases to obscure or avoid the truth altogether!"* [22]  The mistake the Ohio court made was failing to distinguish between a suit seeking redress for perjury and one seeking damages from a witness for telling the truth!  For it is difficult to perceive how perjury aids in the administration of justice or how using the deterrent effect of civil redress will hamper it.

Nevertheless, in 1845 a New Hampshire court rejected plaintiff's plea for redress for harm arising from perjury on the basis of "estoppel" and "high principles of public policy, and for the purposes of public quiet and order." [23]   Subject remedy was also disallowed by a Louisiana court because to allow it would result in endless litigation.[24]

Most if not all of the decisional law in this country tends to ignore the public policy established by both our constitution and statutes and for support falls back on the moldy remains of ancient judicial shibboleths promulgated nearly four centuries ago.  One exception, however, is an outstanding opinion by the Ohio Supreme Court in which the court overturned the "weight of precedent for a century and more, in both American and English ruling cases" in order to allow a civil action for damages resulting from perjured testimony given by a defendant before a grand jury.[25] The court saw no redeeming virtue in a judicially or statutorily bred "public policy" that contravenes and nullifies constitutionally granted rights and incisively challenged the intellectual and legal validity of such thinking.  Said the court: "It is, to

---

19.  *Id.*  (Emphasis added.)

20.  This language, according to Gordon, is contained in one of several reports of *Damport,* the most extensive one being Croke Eliz. 520, No. 8. *See* Gordon, *supra* note 13, at 157 & n. 69.

21.  *Godette v. Gaskill,* 151 N.C. 52, 65 S.E. 612, 613 (1909).

22.  *Bickerstaff v. Hingsley,* 1 Ohio App. 91, 92 (1913).  (Emphasis added.)

23.  *Curtis v. Fairbanks,* 16 N.H. 542, 545 (1845).

24.  *Gusman v. Hearsey,* 28 La.Ann. 709 (1876).

25.  *Kintz v. Harriger,* 99 Ohio St. 240, 124 N.E. 168 (1919).

say the least, a singular sort of logic that holds that any ordinary citizen, in any ordinary conversation, by the use of false and malicious slander, wrongs another ... the latter has a right of action in damages, but that when the wrongdoer ... uses a court of justice as the vehicle for his perjury ... a public policy should intervene to protect him in his wrongdoing and save him from redressing the grievous injury he has [inflicted on] his fellow citizen. What do courts mean when they say that a public policy demands the absolute privilege of such [false] testimony?" We agree with the thrust of the Ohio court's reasoning. The courts have no duty to protect known perjurers.

In this state, as we have seen, both our constitution and our statutes establish a public policy contrary to that rooted in the speculative concepts conceived at a time when English society had not yet completely emerged from medieval feudalism and its judicial system was still in an unsettled stage of development. An examination of the various ratiocinations underlying the denial of civil redress for perjury by the Lord Justices of the King's Bench will suffice to demonstrate their apocryphal if not spurious nature.

Take, for instance, the primary reason offered by the *Damport* court to deny plaintiff relief—that since defendant could be criminally prosecuted for perjury under 5 Eliz. c. 9, the defendant might be punished twice if civil redress were permitted. In contrast to such view our law does not now and never has considered recovery of compensatory damage to be punishment. The *Damport* court, incidentally, had to be talking only about compensatory damage because that is all that Damport recovered in the trial court. Even with regard to punitive damages no court in this country, so far as we can determine, has ever denied such civil relief for an intentional tort merely because the wrongful act also happened to be a crime. Certainly the courts of this state have not.[26] Surely no one would suggest that a maimed victim of an assault and battery has no right to recover both compensatory and punitive damages from one criminally convicted of such offense.

Another reason given by the *Damport* court was the lack of precedent. With naught but a moment's reflection on this particular statement it should have dawned on his majesty's justices that the idea was at war with the one concept that legal scholars the world over consider one of the single most important contributions of the Anglo-Saxon legal system to jurisprudence—the creation of common law by resolving controversies concerning which no specific law or precedent exists. Indeed the *Damport* court did just that. And the flip side is that had it decided the case the other way it could have used the very same spurious reason (or nonreason) for doing so.

The third reason given by the *Damport* justices was that if plaintiff was allowed to recover "every witness would be drawn in question" and punished "for his oath upon a secret intent" of the jury and, as we pointed out earlier, all witnesses "would be terrified to speak the truth!"[27]

Such prophetic rationalization, aside from being an affront to common sense, is irreconcilable with the *Damport*'s double punishment concept in that the court gives tacit approval to criminal sanctions which are basically intended to "terrorize" witnesses into telling the truth. If this is indeed the goal of criminal sanctions it is not entirely clear how the allowance of civil redress would have the opposite effect, viz. make witnesses afraid to tell the truth.

**26.** E.g., assault and battery are crimes. 21 O.S. 1981 §§ 641–650.1. Societal redress by criminal prosecution is no bar to the victim's personal recovery of both compensatory and punitive damages in a civil action. *Leforce v. Cooper,* 87 Okl. 9, 208 P. 795 (1922). The same is true of assorted other intentional acts that are both crimes and torts, e.g. libel and slander, fraud, larceny, arson, trespass, driving while drunk, etc.

**27.** Gordon, *supra* note 13, at 157.

Such reasoning is at war with both experience in this country and the statutorily expressed public policy of this state.

Moreover, from the standpoint of deterrence it appears that criminal sanctions have not effectively curbed perjury and need to be supplemented with the restraining effect of potential civil liability. All, we daresay, will accept the conclusion that perjury is incompatible with the integrity and proper administration of justice. Yet, studies indicate criminal sanctions offer but a small obstacle to perjury resulting in an urgent need for more effective deterrents.[28] For instance, of some 20,000 federal prisoners being held on June 30, 1968, only two had been sentenced for perjury.[29] Of 41,108 federal prosecutions begun in 1975 only 225 were for perjury.[30] In this state, contrary to the *Damport* perceptions, it is statutorily established public policy to deter wrongdoing through civil actions. This public policy is embedded in the statute authorizing the remedial recovery of compensatory damages for the violation of private rights by specifying such redress is allowed as "the means of securing their [private rights'] observance." [31]

Nor has the "flood of litigation" prediction of the *Damport* court been the experience of the one state in this country that has statutorily permitted recovery of damages resulting from testimonial perjury at trial. The state of Maine adopted such a statute over a century ago.[32] Eagle reports that only three lawsuits for perjury were argued before the appellate courts of Maine during the 100 years that the statute

has been on the books, the most recent one being *Milner v. Hare*, decided 60 years ago.[33] This, we think, rather dramatically demonstrates either that the statute has functioned as a strong deterrent to perjury or that few cases arise which possess the essential elements of the tort. When such a situation does occur, justice seems to demand a remedy. Such a case once came before the Tenth Circuit Court of Appeals.[34] The facts involved perjury arising in Oklahoma and to drill around what the court found in American Jurisprudence and Corpus Juris Secundum to be the "fundamental" law—that the victim of perjury has no remedy—the tribunal permitted recovery of damages for "false and fraudulent acts and conduct" of the perjurer. The allowance of recovery in this case has not operated to open the "floodgates" of litigation. Of course if it had it would indicate the need for such relief was even greater than is generally realized and would be another reason for permitting civil redress for perjury.

■ We hold that the law of this state provides a remedy to one who suffers detriment from the tort of perjury committed by a witness during a court proceeding. The essential elements of the tort are those required in an action for deceit except for one variant—it is the court or jury that is deceived rather than the injured party. More specifically the tort of perjury occurs when, during the course of a judicial proceeding, a witness makes a material misrepresentation knowing the statement is false or he makes it recklessly, i.e. without

---

28. Eagle, *Civil Remedies for Perjury: A Proposal for a Tort Action*, 19 Ariz.L.Rev. 349, 351 (citing a number of law review articles and the *Report of the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society* 347 (1968)).

29. *Id.* (citing *Federal Bureau of Prisons, A Report of the Work of the Federal Bureau of Prisons*, table A7, at 29 (1968)).

30. *Id.* (citing *Director of the Administrative Office of the United States Court, Annual Report*, table D2, at 412 (1975)).

31. 23 O.S.1981 § 1.

32. *See supra* note 10.

33. 126 Me. 14, 135 A. 522 (1926); *see* Eagle, *supra* note 28, at 374–75 & n. 165.

34. *See Morgan v. Graham*, 228 F.2d 625, 627 (10th Cir.1956). *Morgan* is a good example of a case featuring all the elements of actionable perjury.

any knowledge of its truth and with the intention that it be acted on by the jury or other finder of facts who in turn does act on the false testimony which results in detriment to the plaintiff.[35]

### B.

■ The remaining question is whether the factual allegations of plaintiff's petition are sufficient to state a cause of action for the tort of perjury? We conclude they are not. The misrepresentation of defendant underlying both the alleged pretrial deceit and the perjury at trial is the "concealment and false denial to the court" that "there were no endeavors" for him to acquire a McDonald franchise and "false denial to the Court ... that he had virtually acquired a franchise." Disclosure of such "endeavor," she concludes, would have provided "true facts of defendant's earning capacity" and caused the court to award her "a property settlement" of at least $150,000 more than it did.

Considering the *facts*, as distinguished from conclusions, alleged to be true for purposes of determining whether the trial court's sustention of the demurrer to the petition was correct, the problem becomes one of determining whether the fact said to be misrepresented is a material one, i.e. one that, had the truth been known to the court, would have resulted in plaintiff probably receiving more of the marital estate than she did.

■ A material misrepresentation as used in the law of deceit is one that is so substantial and important as to significantly affect or influence the party to whom it is made.

It is difficult for us to see how the "endeavors" of plaintiff to achieve a futuristic objective could be material to the issues tried in the divorce action. Merely having either "plans" or carrying on "endeavors"

with respect to unrealized goals is not a divisible asset. It is more of a speculation. True, certain goal-oriented "endeavors" may, if ultimately successful, have a bearing on the husband's future income, or as plaintiff alleges, his earning capacity, but if relevant at all they would be limited to the issue of support as distinguished from division of marital assets.

And there is another serious problem with her allegations. Plaintiff alleges that a "typical reward for a successful McDonald's corporation employee, such as defendant herein, is to arrange for said employee to have an interest in, or become an owner of one of the many McDonald's fast food restaurants; ... [which] often gross approximately $1,500,000.00 per year in the state of Oklahoma." She also alleges defendant and various employees falsely told her *before* the divorce action was filed that "there were no endeavors for" such an acquisition by defendant. This implies she was aware of the alleged company policy and such knowledge enabled her to do two things. One, attempt discovery within the means provided by law and two, testify at the divorce hearing concerning what she knew of the McDonald policy in question and to the fact, as she alleges, that defendant "became a fast moving executive for McDonald's." There is, incidentally, no allegation that evidence was not presented at the divorce hearing to rebut defendant's denial of the alleged "endeavors."

Finally plaintiff says nothing about the specifics of the "endeavors." Was defendant to have only an interest in or was he to own a big M restaurant? What net income did defendant plan to receive? Was there a chance of such an enterprise failing? These questions are unanswered.

For these reasons we hold plaintiff's second amended petition does not state a cause of action for either pretrial deceit or the tort of perjury.

---

**35.** For elements of fraud and deceit generally see *Tice v. Tice,* 672 P.2d 1168 (Okl.1983); *Wright v. Cies,* 648 P.2d 51 (Okl.Ct.App.1982);

*Bradshaw v. Bradshaw,* 578 P.2d 762 (Okl.Ct. App.1977).

## IV

The next question is whether the facts alleged are sufficient to permit vacation or modification of the divorce decree. We hold they are not.

■ Plaintiff's request for modification is a belated direct attack on the divorce judgment insofar as it resolved the issues pertaining to division of the marital estate and alimony. Such an attack is impermissible unless the plaintiff can bring herself within the limited provisions of 12 O.S.1981 §§ 1031, 1031.1, 1032 or 1033. Even collateral impeachment of a judgment is forbidden except upon proof of fraud going to the jurisdiction of the court. *Terrell v. Gotcher*, 197 Okl. 650, 174 P.2d 229 (1946). There is no allegation of such fraud here.

The attack appears to be founded on the fourth ground listed in 12 O.S.1981 § 1031(4), which authorizes vacation of a judgment for fraud practiced by the successful party in obtaining it.

■ There are at least two legal reasons why plaintiff's allegations do not bring her within the reach of this statute.[36] First, plaintiff does not allege the type of fraud contemplated by section 1031(4). Such fraud is restricted to a narrow range of malfeasance extrinsic and collateral to the issues tried and generally consists either of conduct which prevents the petitioning party from fairly presenting her case in court, or jurisdiction-related deception which is practiced on the court directly or through misuse of its process. Allegations that a judgment was obtained on evidence known by plaintiff to be false are not sufficient to permit disturbance of the judgment when such party was not prevented from fully and fairly presenting his side of the case. *Sadberry v. Hope*, 444 P.2d 175 (Okl.1968).

■ And second, the allegations of the petition must comply with the requirements of 12 O.S. 1981 § 1033, which specify, among other things, that failure of a petition to vacate or modify a judgment to set forth the assailed judgment deprives the court of jurisdiction over the subject of the action.[37] Plaintiff's petition here does not set forth or describe the challenged divorce decree.

■ The sine qua non of plaintiff's action, as we have seen, is the alleged failure of her proof in the divorce action concerning issues heard and resolved in it—a shortcoming she attributes to the defendant's previously mentioned perjury and pretrial concealment. She thus concedes, as she must, that the substructure of her complaint entails relitigation of issues earlier tried and resolved by a decree that has long since become res judicata.

As we mentioned earlier, there is an absence of any indication that she availed herself of one of the several statutory pretrial methods of discovery—a failure that seems particularly incredible in view of her allegation that the McDonald people began lying to her about the "endeavors" of defendant to acquire a Big Mac dispensary. This suggests she had reason to be suspicious of such "endeavors" and began making inquiries about it before the divorce action was filed. These averments underscore the fact that plaintiff apparently could have, and certainly should have, garnered the evidence in advance of trial and presented it in court.

We hold the divorce decree is res judicata with regard to the marital property and alimony rights of the parties; that plain-

---

**36.** One statutory ground of a demurrer not pleaded by defendant is that there is another action pending between the same parties for the same cause. 12 O.S.1981 § 267 (Third). The record indicates a pending petition to vacate the decree in the divorce action, although we are told in a brief that it has been dismissed.

**37.** Unless there is a substantial compliance with section 1033, the trial court is without jurisdic-

tion. *Arnold v. Arnold,* 207 Okl. 352, 249 P.2d 734 (1952). "Setting forth" the assailed judgment is a prescribed prerequisite which is accomplished by stating it in full. *Hill v. Williams,* 6 Kan. 17 (1867). Substantial compliance requires such judgment to be described or set forth. *Allen v. Gaston,* 74 Okl. 320, 189 P. 183 (1920); *Mosely v. Southern Manufacturing Company,* 4 Okl. 492, 46 P. 508 (1896).

tiff's prayer for vacation or modification of the divorce decree is an impermissible attempt to relitigate tried issues resolved in a decree that long ago became final.

## V

Since, then, the petition fails to state any cause of action we hold the sustention of the general demurrer was not error.

We therefore affirm the order appealed, dismiss plaintiff's action, and render judgment for defendant together with costs of this appeal.

Affirmed.

RAPP, J., concurs.

STUBBLEFIELD, J., concurs in result.