C.H. (SKEET) SMITH TRUCKING COMPANY, INC., Plaintiff,

v.

BILL HODGES TRUCKING COMPANY, INC., et al., Defendants.

No. CIV–86–1165–P.

United States District Court, W.D. Oklahoma.

Oct. 5, 1987.

Steven Colbert, Ardmore, Okl., for plaintiff.

Burck Bailey and Eric Eissenstat, for defendant Turner Brothers Trucking Co.

Fellers, Snider, Blankenship, Bailey & Tippens, Okl. City, Okl., Wilburn Williamson, for defendants Hodges Trucking Co. and Garret Bros. Trucking Co.

Dykeman, Williamson & Williamson, Oklahoma City, Okl., for other defendants.

Louis Bodnar, Oklahoma City, Okl., pro se.

## ORDER GRANTING SUMMARY JUDGMENT

PHILLIPS, District Judge.

This matter comes before the Court upon the defendants' various Motions for Summary Judgment. Plaintiff's claims are based upon restraint of trade and monopolization allegations arising under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. For the reasons set forth below, defendants' Motions for Summary Judgment are hereby GRANTED.

Plaintiff is an Oklahoma corporation with its principal place of business in Ardmore, Oklahoma. Plaintiff's company was formed in 1979 and is primarily engaged in the intrastate transportation of oil field commodities. Defendant Turner Brothers Trucking Company ("Turner") is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma, and is engaged in the transportation of oil field commodities. Defendant Bill Hodges Trucking Company ("Hodges"), Garrett Bros., Inc. ("Garrett"), and Bill Jackson Rig Company, Inc. ("Jackson"), are also Oklahoma corporations engaged in the transportation of oil field commodities. Defendant Louis J. Bodnar ("Bodnar") is an attorney licensed to practice law in the State of Oklahoma and previously served as counsel for the codefendants herein.

The facts presented to the Court upon a Motion for Summary Judgment must be construed in a light most favorable to the nonmoving party. *Board of Education v. Pico*, 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The Court is precluded from granting summary judgment where there is genuine dispute as to a fact which is material, that is a fact which is relevant under the applicable substantive law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Bright v. Moss Ambulance Service, Inc.*, 824 F.2d 819 (10th Cir.1987). Finally, the movant must show entitlement to judgment as a matter of law. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985).

## FACTS

The intrastate transportation of oil field commodities is extensively regulated by the Oklahoma Corporation Commission ("OCC") (Turner Br. at 3).[1] The OCC actively supervises all activities of motor carriers and requires all motor carriers to obtain a certificate declaring that "public convenience and necessity" require that the services be performed by the carrier. The OCC extensively regulates (a) the tariffs, rates, fares and charges of carriers; (b) the points within which motor carriers may transport oil field commodities; and (c) the size and weight of each shipment or load. *Id; See* 47 O.S. § 161 *et seq.*

An applicant carries the burden of proving to the OCC that existing carriers are not providing reasonably adequate service. In addition, there is a presumption, in the absence of competent evidence to the contrary, that intrastate common carriers operating under existing certificates are rendering adequate service between the points or within the areas authorized to be served by them. 47 O.S. § 166.

---

1. "Turner Br. at ——" refers to the Brief in Support of Motion of Turner Brothers Trucking Company for Summary Judgment, filed August 27, 1987, and the corresponding page number. All other defendants have adopted the Turner brief.

Plaintiff has set out the procedure for obtaining a motor carrier certificate from the OCC as follows:

a. Application is filed.

b. Order of Commission referring Cause to Referee for hearing and setting date of hearing.

c. Publication of hearing notice in newspaper in county of applicant's place of business.

d. Commission docket circulated giving notice of each applicant's name, address and commodities and area requested in application. Listing in Commission docket must be at least fifteen (15) days prior to date of hearing.

e. Hearing must be set within forty-five (45) days of the filing of the application. Hearing held at which applicant and any protestants appear and evidence presented.

f. Referee's report and recommendations issued.

g. Order of Commission issued if no exceptions are taken to the report and recommendations of the Referee.

h. Exceptions to the report by any party adversely affected must be filed within five (5) days after the filing of the report.

i. Hearing before the Commission on exceptions—no evidence taken

j. Commission Order must be issued within sixty (60) days of teh [sic] final hearing.

k. Issuance of certificate or permit upon compliance with requirements of filing insurance, tariffs, and purchase of identification devices. In the case of haulers of deleterious substances, a license for disposal and proof of access to an approved disposal well is required. [Complaint at ¶ 6, pp. 6–7].

Plaintiff's antitrust claims hinge upon the alleged conspiratorial activities of the defendants, in proceedings before the OCC, and their protests of the applications of plaintiff and others. Plaintiff has summarized its claims by stating that as early as February 14, 1975, the defendants entered into a jointly funded program to protest applications for authority to transport oil field equipment and supplies before the OCC; that defendants utilized a single attorney, Bodnar, on November 6, 1978, to facilitate these protests through a reporting system; that defendants intended to protest all applications for authority to transport oil field commodities between points in the State of Oklahoma, with or without merit, and with intentional design to delay, harass and deter new competitors in the marketplace; that said program of baseless, repetitive litigation persisted during the "oil boom"; that defendants' actions resulted in a situation where plaintiff was denied authority for a period of approximately 4½ years from the time of his first application; and that defendants' actions constituted antitrust violations for which plaintiff has suffered injuries. (Pl. Brief at 35–36).[2]

Plaintiff first applied for statewide authority on September 14, 1979. After public hearing and the taking of evidence on October 22, 1979, the Referee for the OCC issued his report in Cause No. MC 46509 granting plaintiff's Application in part. The Referee restricted plaintiff's authority to a four-county area. (Turner Br. at 5 and Exhibit B thereto). At said hearings, Hodges and Garrett were the only defendants in attendance. (Exhibit B to Turner Br. at 3). Larry E. Dean, for Hodges, testified that Hodges had no problem in providing equipment to customers and could provide the witnesses testifying in that cause with the equipment and service they required. *Id.* Tim Foster, for Garrett, testified that none of the witnesses had called Garrett for service and it could provide the equipment if called. In addition, Foster testified that Ratliff City Trucking was already a competitor and

---

2. "Pl. Brief at ——" refers to plaintiff's Brief in Support of Response to [the various defendants'] Motion[s] for Summary Judgment, filed September 15, 1987, and the corresponding page number.

Garrett needed the additional business to keep its equipment busy.

Plaintiff again sought statewide authority by Application filed May 8, 1980. On August 21, 1980, the Referee for the OCC in M.C. 46509, Sub. 1, denied plaintiff's Application and recommended that the OCC investigate the operations of plaintiff to determine whether the plaintiff was exceeding his existing authority. (Exhibit E to Turner Br.) Again, Hodges and Garrett were the only defendants represented at the hearing. The testimony of Larry E. Dean, for Hodges, was summarized by the Referee as follows in pertinent part:

Transportation service is offered seven days per week, 24 hours per day. Every facet of oil field transportation work is performed. Equipment operated includes 118 tractors, 154 trailers of various design and 16 cranes. Hodges averages approximately 70 rig moves per month in addition to its other transportation services. The company needs additional business to keep its equipment and employees busy. [*Id.* at 3].

The testimony of Tim Foster, for Garrett, was also summarized as follows in pertinent part:

The company [Garrett] has a terminal in Oklahoma City and operates three rig up tandems, 17 road trucks, 2 lowboys and 19 floats. Service is offered to all points seven days per week, 24 hours per day. Service has been provided for Armstrong Tool and Supply and Big Chief Drilling Co. without complaint. More service can be provided to these shippers upon demand. [*Id.*].

By Order No. 181603 in M.C. 46509, Sub. 1, the OCC adopted the Referee's findings and conclusions. Plaintiff subsequently appealed the Commission's ruling to the Oklahoma Supreme Court.

As a result of the Referee's recommendation of an investigation into plaintiff's activities, the OCC filed a complaint against plaintiff on January 14, 1983, alleging sixty violations of OCC rules and regulations. The OCC issued Order No. 234102

finding the plaintiff in violation of the rules and laws of Oklahoma by exceeding its authority granted by the OCC. Although plaintiff generated more than $5,000,000.00 in business in violation of its OCC authority, he was successful in obtaining a compromise and settlement of this matter, resulting in plaintiff being fined $30,000.00. (Exhibit C to Turner Br.).

In early 1983, plaintiff met with then Oklahoma Corporation Commissioner Hamp Baker for advice concerning his transportation authority. (Smith depo. at 69). Baker advised plaintiff to dismiss his appeal before the Supreme Court and refile an application seeking statewide authority, both of which he did. (Smith depo. at 69–70).

On February 8, 1983, the OCC, by Order No. 233011, granted plaintiff temporary statewide authority. (Exhibit I to Turner Br.) On February 3, 1984, an evidentiary hearing was held on plaintiff's third application for authority. Jackson, Turner and Hodges protested this application.[3] The OCC, by Order No. 259977, found that the temporary authority should be converted to full statewide authority. (Exhibit J to Turner Br.)

## SECTION 1 VIOLATIONS

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations is declared to be illegal." 15 U.S.C. § 1.

Plaintiff concedes the applicability of the "Noerr–Pennington" doctrine to the facts of this case and has admitted the narrow issue before the Court by stating, "... if the plaintiff cannot prove that the protests of defendants were a 'sham,' then the plaintiff is not entitled to recover." (Pl. Brief at 19).

The Noerr-Pennington doctrine was first enunciated in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*

---

**3.** Neither plaintiff nor defendant has provided the Court with any evidence of what the protes-

tants' testimony was concerning plaintiff's third application for statewide authority.

365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The doctrine has become an exception to, or immunity from, Sherman Act liability. This exception applies to those activities comprising mere solicitation of governmental action with respect to the passage and enforcement of laws. The rationale behind the rule is the protection of the right of private parties to petition government and to protect the governmental interest of a free flow of information and views. *See United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); L. Sullivan, Handbook of the Law of Antitrust at 741 (1977).

In *California Motor Transport,* the Court extended the sham exception to courts and administrative adjudicative bodies, stating:

> We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors. [404 U.S. at 510–11, 92 S.Ct. at 611–12].

The *California Motor Transport* Court cited misrepresentation in the adjudicatory process, a pattern of baseless, repetitive claims, perjury of witnesses and fraud as examples of possible sham conduct. The Tenth Circuit recently held:

> Concerted efforts to influence departments of government, including administrative agencies, are protected from the reach of all sections of the antitrust laws regardless of anticompetititve purpose as long as the activities are not a sham to cover an attempt to interfere directly with the business relationships of a com-

petitor or to bar competitors from meaningful access to an agency or tribunal. [*Bright,* 824 F.2d at 822].

The *Bright* Court noted that the "sham" exception is a narrow one and held: "Appellants have not presented a factual question whether Moss's attempts to enforce its franchise corrupted 'governmental processes to such an extent that it constituted access-barring conduct' to justify application of the narrow 'sham exception' to the Noerr-Pennington doctrine." *Id.* citing *Razorback Ready Mix Concrete Co. v. Weaver,* 761 F.2d 484, 487 (8th Cir.1985). The *Razorback* Court held that improper interference is one where there are illegal "practices such as perjury, fraud, conspiracy with or bribery of governmental decision-makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process." *Razorback,* 761 F.2d at 487.

As previously stated, plaintiff has acknowledged that its case must stand or fall on its evidence of "sham." Notwithstanding the allegations of the Complaint,[4] plaintiff now claims only that defendants have perjured themselves by testifying they were providing reasonably adequate service. In a nutshell, plaintiff contends that this testimony was *prima facie* evidence of perjury because it was "common knowledge" that nobody was providing reasonably adequate service during the "oil boom." (Pl. Brief at 5). The sufficiency of plaintiff's proof on this claim will be examined below.

Oklahoma defines the offense of perjury as follows:

> Whoever, in a trial, hearing, investigation, deposition, certification or declaration, in which the making or subscribing of a statement is required or authorized by law, makes or subscribes a statement under oath, affirmation or other legally binding assertion that the statement is true, when in fact the witness or declar-

---

**4.** Plaintiff initially made the allegation that defendants also "conspired through threats, pressure and the exercise of infulence [sic] to discourage from testifying those shippers contemplating supporting an application for new or expanded authority ..." (Complaint at ¶ 8).

However, plaintiff now acknowledges that it has no evidence of any threats, pressure, exercise of influence or intimidation of shipper witnesses. (Smith depo. pp. 14–18, 16–17, 117–118, and 128).

ant does not believe that the statement is true or knows that it is not true or intends thereby to avoid or obstruct the ascertainment of the truth, is guilty of perjury. It shall be a defense to the charge of perjury as defined in this section that the statement is true. [21 O.S. § 491].

In Oklahoma, the tort of perjury occurs:
[W]hen, during the course of a judicial proceeding, a witness makes a material misrepresentation knowing the statement is false or he makes it recklessly, i.e. without any knowledge of its truth and with the intention that it be acted on by the jury or other finder of facts who in turn does act on the false testimony which results in detriment to the plaintiff. [*Copeland v. Anderson*, 707 P.2d 560 (Okl.App.1985)].

Regardless of whether the criminal or civil standard of perjury is the appropriate standard for proof of the "sham" exception to Noerr-Pennington, plaintiff must come forth with proof of the elements of one of the above definitions. In addition, plaintiff must show that defendants testified and that they stated they were providing "reasonably adequate service" without any knowledge of its truth. Plaintiff has wholly failed in this regard.

Typical of plaintiff's proof of perjury, is its reliance on the intangible concept of "common knowledge." When asked whether he had any proof to support his claim that protests were to be entered in every proceeding regardless of the merits, plaintiff Smith replied that he had no documented proof but that: "Well, its just common knowledge that that's the way it goes down." (Smith depo. at 136–7). An excellent synopsis of plaintiff's "common knowledge" proof on the perjury issue surfaces in the following deposition exchange after the plaintiff consulted with his attorney:

A. [By Skeet Smith] Well, he just reminded me of the fact that I sat in the hearing room and listened to perjured testimony that they could all meet the needs of these shippers, when, in fact, *I think it was very common knowledge*

in '79, '80 and '81 that there wasn't anybody meeting the needs totally of the shippers. *And I think that just almost goes without saying.*

And *every one of them* testified during that during—I'll correct that real quick, I know you are going to jump on that, *that testified at those hearings, testified they certainly did have the equipment to meet those needs. And I think it's obvious they didn't have.*

And I say obvious by the facts that all of them was buying equipment as fast as they could buy it and rigging up trucks as fast as they could rig them up and still wasn't able to take care of the needs.

So, I think they sit in the hearing room and say they have a need for that business and they can certainly take care of it, when they know that they are six, seven days behind right then, *I think that's certainly evidence in itself.*

\*   \*   \*   \*   \*   \*

Q. [By Mr. Eissenstat] Why don't you tell the court, since you made that serious allegation, each and every witness who gave perjured testimony?

A. Well, *I think that would be a matter of record, that every one that testified in those hearings gave perjured testimony.*

Q. What proof do you have that that testimony was not true and correct?

A. Well, if they were all meeting the needs, like ... [Smith depo. at 89–90; Exhibit 4 to Pl. Brief] [emphasis added].

The above are but a few examples of the quality of plaintiff's "sham" evidence. As correctly pointed out by defendants, plaintiff has failed to come forward with specific facts showing (1) who testified; (2) what defendant made what misrepresentation; (3) what the alleged misrepresentation was; (4) what date, place and time the alleged misrepresentation occurred, or any other evidence to support its charges. Plaintiff merely relies on "common knowledge," "matters of public record," and the general contention that any person who at any time went before the OCC and testified that

they were rendering adequate service, committed perjury.

Plaintiff had ample time to develop such evidence if it existed. The Court has previously granted nine extensions of deadlines in this matter and recently denied what would have been the tenth extension. If properly developed, violations in accordance with *California Motor Freight* may have come to light. The Court, however, cannot rely on suspicions, suggestions and conclusory allegations in opposition to motions for summary judgment. Since plaintiff's allegations of conspiracy are overlapping, they will be discussed under plaintiff's Section 2 claims.

## SECTION 2 VIOLATIONS

■ Plaintiff also alleges violations of Section 2 of the Sherman Act which provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court. [15 U.S.C. § 2].

"The elements of monopolization under Section 2 are 'the possession of monopoly power in the relevant market' and 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Bright*, 824 F.2d at 823, citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co,* 738 F.2d 1509, 1519 n. 12 (10th Cir.) *aff'd*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

■ Proof of the offense of attempted monopolization requires the establishment of the following: (1) relevant market; (2) dangerous probability of success in mono-

polizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of the attempt. *Id.* citing *Olsen v. Progressive Music Supply, Inc.*, 703 F.2d 432, 436–37 (10th Cir.), *cert. denied*, 464 U.S. 866, 104 S.Ct. 197, 78 L.Ed.2d 172 (1983).

For plaintiff to succeed under any of the theories set out under Section 2, it must produce evidence of the defendants' relative market power. "At the very least, it must be shown how much of the relevant market a defendant controls if market power is to be evaluated." *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies*, 783 F.2d 159, 161–62 (10th Cir.1986). The Tenth Circuit recently affirmed an order granting summary judgment in an antitrust case where an affidavit of market power was the only evidence presented to the court. The court stated: "With the exception of the facts recited regarding Moss's share of the market, the affidavit contains only reiterations of the allegations in the complaint and conclusions of law. Such allegations are insufficient to show the existence of a triable issue." *Bright*, 824 F.2d at 824.

The instant record is replete with the inadequacies of plaintiff's proof of monopolization. Plaintiff makes the following inexplicable argument:

> The claim of Turner Brothers that there is no study or other evidence to show what share of the market Turner Brothers has individually or collectively with the other defendants during the time in question is without merit. *The defendants have failed to seek discovery from witnesses of plaintiff regarding market factors*, and in opposition to the motion, the evidence from defendants reflects that the competitors in the market place are Turner Brothers, Bill Jackson, Garrett Brothers, Smith Trucking Company of Perry, John Hensal Trucking, Bill Hodges Trucking and C.H. "Skeet" Smith Trucking. See depo. of Larry Dean at page 44 attached hereto and marked Exhibit "17." [Pl. Brief at 7–8; *see also Id.* at 16–17]. [emphasis added].

It strains all reason to argue that defendants' failure to seek discovery absolves plaintiff of its burden to prove an essential element of its claim. In any event, the deposition of Larry Dean (Exhibit 17 to Pl. Brief) provides even less in the form of proof than the argument of counsel:

Q. You had other competitors?

A. We had—yes, sir, we had tons of those.

Q. And who were those in 1980?

A. Well, the Turner Brothers, Bill Jackson, Garrett Brothers, Smith Trucking Company, John Hensal Trucking Company. Just a slug of them. I don't, you know, that's—were your big carriers.

Q. Those were the primary—

A. A slew of small carriers that were, that were running during that time.

Q. Most of those running with restricted, weight restricted authority?

A. Some did, some did not. Then— [Dean depo. at 44].

Plaintiff's proof of monopoly power is simply fatally defective. Plaintiff has not met its burden by producing evidence of market data of any kind. Nor has plaintiff identified in any way the market power of the defendants individually or collectively. Consequently, plaintiff is unable to make any showing of market power in a relevant geographic and product market, as required for its monopolization complaint, or any "dangerous probability of success" associated with any attempted monopolization theory.

■ Plaintiff also alleges that the defendants conspired to violate the antitrust laws in order to bar potential applicants from the OCC rather than to elicit rulings favorable to their own economic positions. Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, ——, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538, 553 (1986). To survive a Motion for Summary Judgment or for a Directed Verdict, a plaintiff seeking damages for antitrust violations must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. *Id.*

Plaintiff must show (1) that a conspiracy existed, and (2) that the object of the conspiracy was to conduct activity outside the ambit of Noerr-Pennington.

Plaintiff has produced a number of documents entitled "Report of Proceedings, Oklahoma Corporation Commission [and the date of the proceedings]." All of these reports are authored by defendant Bodnar, an attorney. These documents include, *inter alia*, upcoming applications, the status of pending applications, results of applications, a report as to the names of the protestants appearing, and the urging of carriers to appear and protest at upcoming hearings. (Exhibit 2 to Pl. Brief). There is no evidence before the Court as to whom these reports were sent, to whom they were addressed, nor who received them. Plaintiff also has a number of account statements from Bodnar to the individual defendants, copies of checks, and evidence of a joint fund between the defendants. While all of this is certainly relevant evidence on plaintiff's conspiracy allegation, it falls well short of the level needed to overcome a Motion for Summary Judgment.

Taking the evidence in its most favorable light to plaintiff, three things have been established: (1) a single attorney (Bodnar) was used by all defendants; (2) a single account was set up by the defendants; and (3) common reporting, including the urging of protests, was used. However, plaintiff has failed to produce *any* evidence which would tend to exclude the possibility that this activity was protected by Noerr–Pennington. As previously stated, plaintiff has failed to produce evidence of a "sham" on either Sherman Act claim and has not produced any evidence on its "monopoly" (Section 2) claim.

Nor has plaintiff shown the alleged conspiratorial activity was not protected by *Noerr*. In fact, plaintiff admits that Turner Brothers' purpose in protesting the applications was to seek a favorable result for their best economic interests. (Smith depo. at 45–46, 77). The Eighth Circuit has taken the position that sham litigation is that "filed by an individual *solely* to harass and not to win a favorable judgment." *Westmac, Inc. v. Smith*, 797 F.2d 313 (6th Cir.1986); *See also Winterland Conces-*

*sions Co. v. Trela,* 735 F.2d 257, 263 (7th Cir.1984); *Omni Resource Development Corp. v. Conoco, Inc.,* 739 F.2d 1412 (9th Cir.1984). The Tenth Circuit has not yet reached the precise issue but has construed the "sham" exception as a "narrow" one. *See Bright,* 824 F.2d at 823. While there is significant other authority for defendants' position that *any* motive to elicit a favorable result obviates the sham exception, this Court need not reach the issue. Plaintiff has completely failed in its burden of production as to evidence of a "sham" (perjury) or evidence that defendants' conduct was attributable only to an intent to harass, effectively resulting in access-barring. There is no proof in the documents or testimony presented that protests were entered in every case with the intentional design to delay, harass and deter new competitors in the marketplace through baseless, repetitive litigation. Plaintiff's "proof" consists merely of conclusory allegations.[5]

## CONCLUSION

This Court believes that the vigorous enforcement of the antitrust laws is essential to our democratic form of society. Moreover, the Court agrees with plaintiff's assertion that summary judgment should be used sparingly in private antitrust actions. While the joint conduct of the defendants in this matter certainly had a potential for abuse, and while arguably joint activities such as this one are ripe for antitrust violations which cross the permissible boundaries of *Noerr,* this case involved serious allegations which simply led nowhere in terms of proof.[6]

Accordingly, it is hereby ordered that all defendants' Motions for Summary Judgment are hereby GRANTED.

---

5. Defendants also move for summary judgment on "state action" and statute of limitations grounds. While both of these grounds may have some merit, the Court deems them unnecessary to evaluate based upon the rulings regarding Noerr-Pennington.

6. The jointly funded program alleged in this case, orchestrated through defendant Bodnar, is apparently no longer operating. (Pl. Brief at 27).