# CALIFORNIA MOTOR TRANSPORT CO. ET AL. *v.* TRUCKING UNLIMITED ET AL.

No. 70–92.   Argued November 10, 1971—Decided January 13, 1972

*Boris H. Lakusta* argued the cause for petitioners. With him on the briefs were *W. D. Benson, John Mac-Donald Smith,* and *Daniel H. Benson.*

*Michael N. Khourie* argued the cause and filed a brief for respondents.

*Dennis N. Garvey* filed a brief for Landmarks Holding Corp. et al. as *amici curiae.*

Opinion of the Court by MR. JUSTICE DOUGLAS, announced by MR. CHIEF JUSTICE BURGER.

This is a civil suit under § 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, for injunctive relief and damages instituted by respondents, who are highway carriers operating in California, against petitioners, who are also highway carriers operating within, into, and from California. Respondents and petitioners are, in other words, competitors. The charge is that the petitioners conspired to monopolize trade and commerce in the transportation of goods in violation of the antitrust laws. The conspiracy alleged is a concerted action by petitioners to institute state and federal proceedings to resist and defeat applications by respondents to acquire operating rights or to transfer or register those rights. These activities, it is alleged, extend to rehearings and to reviews or appeals from agency or court decisions on these matters.

The District Court dismissed the complaint for failure to state a cause of action, 1967 Trade Cas. ¶ 72,298. The Court of Appeals reversed, 432 F. 2d 755. The case is here on a petition for a writ of certiorari, which we granted. 402 U. S. 1008.

The present case is akin to *Eastern Railroad Conference* v. *Noerr Motor Freight,* 365 U. S. 127, where a group of trucking companies sued a group of railroads to restrain them from an alleged conspiracy to monopolize

the long-distance freight business in violation of the antitrust laws and to obtain damages. We held that no cause of action was alleged insofar as it was predicated upon mere attempts to influence the Legislative Branch for the passage of laws or the Executive Branch for their enforcement. We rested our decision on two grounds:

(1) "In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act." *Id.*, at 137.

(2) "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.*, at 138.

We followed that view in *United Mine Workers* v. *Pennington*, 381 U. S. 657, 669–671.

The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition. See *Johnson* v. *Avery*, 393 U. S. 483, 485; *Ex parte Hull*, 312 U. S. 546, 549.

We conclude that it would be destructive of rights of association and of petition to hold that groups with

common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-à-vis* their competitors.

We said, however, in *Noerr* that there may be instances where the alleged conspiracy "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U. S., at 144.

In that connection the complaint in the present case alleged that the aim and purpose of the conspiracy was "putting their competitors, including plaintiff, out of business, of weakening such competitors, of destroying, eliminating and weakening existing and potential competition, and of monopolizing the highway common carriage business in California and elsewhere."

More critical are other allegations, which are too lengthy to quote, and which elaborate on the "sham" theory by stating that the power, strategy, and resources of the petitioners were used to harass and deter respondents in their use of administrative and judicial proceedings so as to deny them "free and unlimited access" to those tribunals. The result, it is alleged, was that the machinery of the agencies and the courts was effectively closed to respondents, and petitioners indeed became "the regulators of the grants of rights, transfers and registrations" to respondents—thereby depleting and diminishing the value of the businesses of respondents and aggrandizing petitioners' economic and monopoly power. See Note, 57 Calif. L. Rev. 518 (1969).

Petitioners rely on our statement in *Pennington* that "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." 381 U. S., at 670. In the present case, however,

the allegations are not that the conspirators sought "to influence public officials," but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process. It is alleged that petitioners "instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases." The nature of the views pressed does not, of course, determine whether First Amendment rights may be invoked; but they may bear upon a purpose to deprive the competitors of meaningful access to the agencies and courts. As stated in the opinion concurring in the judgment, such a purpose or intent, if shown, would be "to discourage and ultimately to prevent the respondents from invoking" the processes of the administrative agencies and courts and thus fall within the exception to *Noerr*.

The political campaign operated by the railroads in *Noerr* to obtain legislation crippling truckers employed deception and misrepresentation and unethical tactics. We said:

> "Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this Court interpreting such legislation. All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical." 365 U. S., at 141.

Yet unethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example. Use of a patent obtained by fraud to exclude a competitor from the market may involve a violation of the antitrust laws, as we held in *Walker*

*Process Equipment* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172, 175–177. Conspiracy with a licensing authority to eliminate a competitor may also result in an antitrust transgression. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.,* 370 U. S. 690, 707; *Harman* v. *Valley National Bank,* 339 F. 2d 564 (CA9 1964). Similarly, bribery of a public purchasing agent may constitute a violation of § 2 (c) of the Clayton Act, as amended by the Robinson-Patman Act. *Rangen, Inc.* v. *Sterling Nelson & Sons,* 351 F. 2d 851 (CA9 1965).

There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.,* effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

Petitioners, of course, have the right of access to the agencies and courts to be heard on applications sought by competitive highway carriers. That right, as indicated, is part of the right of petition protected by the First Amendment. Yet that does not necessarily give them immunity from the antitrust laws.

It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. *Giboney* v. *Empire Storage Co.*, 336 U. S. 490. In that case Missouri enacted a statute banning secondary boycotts and we sustained an injunction against picketing to enforce the boycott, saying:

> "It is true that the agreements and course of conduct here were as in most instances brought about through speaking or writing. But it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. . . . Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." 336 U. S., at 502.

In *Associated Press* v. *United States,* 326 U. S. 1, we held that the Associated Press was not immune from the antitrust laws by reason of the fact that the press is under the shelter of the First Amendment. We said:

> "Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the

First Amendment does not sanction repression of that freedom by private interests." *Id.*, at 20. Accord, *Citizen Publishing Co.* v. *United States,* 394 U. S. 131, 139–140. Cf. *Eastern States Lumber Assn.* v. *United States,* 234 U. S. 600.

The rationale of those cases, when applied to the instant controversy, makes the following conclusions clear: (1) that any carrier has the right of access to agencies and courts, within the limits, of course, of their prescribed procedures, in order to defeat applications of its competitors for certificates as highway carriers; and (2) that its purpose to eliminate an applicant as a competitor by denying him free and meaningful access to the agencies and courts may be implicit in that opposition.

First Amendment rights may not be used as the means or the pretext for achieving "substantive evils" (see *NAACP* v. *Button,* 371 U. S. 415, 444) which the legislature has the power to control. Certainly the constitutionality of the antitrust laws is not open to debate. A combination of entrepreneurs to harass and deter their competitors from having "free and unlimited access" to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities of the group are ways of building up one empire and destroying another. As stated in the opinion concurring in the judgment, that is the essence of those parts of the complaint to which we refer. If these facts are proved, a violation of the antitrust laws has been established. If the end result is unlawful, it matters not that the means used in violation may be lawful.

What the proof will show is not known, for the District Court granted the motion to dismiss the complaint. We must, of course, take the allegations of the complaint at face value for the purposes of that motion. *Walker*

*Process Equipment* v. *Food Machinery & Chemical Corp.*, 382 U. S., at 174–175. On their face the above-quoted allegations come within the "sham" exception in the *Noerr* case, as adapted to the adjudicatory process.

Accordingly we affirm the Court of Appeals and remand the case for trial.

*So ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN joins, concurring in the judgment.

In the *Noerr* case [1] this Court held, in a unanimous opinion written by Mr. Justice Black, that a conspiracy by railroads to influence legislative and executive action in order to destroy the competition of truckers in the long-haul freight business was wholly immune from the antitrust laws. [2] This conclusion, we held, was required in order to preserve the informed operation of governmental processes and to protect the right of petition guaranteed by the First Amendment. [3] Today the Court retreats from *Noerr,* and in the process tramples upon important First Amendment values. For that reason I cannot join the Court's opinion.

In *Noerr* the defendants were joined together in an effort to induce legislative and executive action. Here,

---

[1] *Eastern Railroad Conference* v. *Noerr Motor Freight,* 365 U. S. 127.

[2] See also *United Mine Workers* v. *Pennington,* 381 U. S. 657, 669–671.

[3] This conclusion, the Court held, was a corollary of our decisions in *United States* v. *Rock Royal Co-operative,* 307 U. S. 533, and *Parker* v. *Brown,* 317 U. S. 341, holding that when a monopoly or restraint of trade is the result of valid governmental action, there cannot be an antitrust violation.

so the complaint alleges, the defendants (petitioners) have joined to induce administrative and judicial action. The difference in type of governmental body might make a difference in the applicability of the antitrust laws if the petitioners had made misrepresentations of fact or law to these tribunals, or had engaged in perjury, or fraud, or bribery.[4] But, contrary to implications in the Court's opinion, there are in this case no allegations whatever of any such conduct on the part of the petitioners. And, in the absence of such conduct, I can see no difference, so far as the antitrust laws and the First Amendment are concerned, between trying to influence executive and legislative bodies and trying to influence administrative and judicial bodies. *NAACP* v. *Button,* 371 U. S. 415; *Brotherhood of Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1; *United Mine Workers* v. *Illinois State Bar Assn.,* 389 U. S. 217; *United Transportation Union* v. *State Bar of Michigan,* 401 U. S. 576.

The Court concedes that the petitioners' "right of access to the agencies and courts to be heard on applications sought by competitive highway carriers . . . is part of the right of petition protected by the First Amendment." Yet, says the Court, their joint agreement to exercise that right "does not necessarily give them immunity from the antitrust laws." *Ante,* at 513. It is difficult to imagine a statement more totally at odds with *Noerr.* For what that case explicitly held is that the joint exercise of the constitutional right of petition *is* given immunity from the antitrust laws.

While disagreeing with the Court's opinion, I would

---

[4] In *Noerr,* the Court emphasized that the defendants' "unethical" conduct did not affect their antitrust immunity for jointly exerting pressure on the Legislative and Executive Branches, 365 U. S., at 141. See, however, *Walker Process Equipment* v. *Food Machinery & Chemical Corp.,* 382 U. S. 172.

nonetheless remand this case to the District Court for trial. The complaint contains allegations that the petitioners have:

1. *Agreed* jointly to finance and to carry out and publicize a consistent, systematic and uninterrupted program of opposing 'with or without probable cause and regardless of the merits' every application, with insignificant exceptions, for additional operating rights or for the registration or transfer of operating rights, before the California PUC, the ICC, and the courts on appeal.

2. *Carried out* such agreement (a) by appearing as protestants in all proceedings instituted by plaintiffs and others in like position or by instituting complaints in opposition to applications or transfers or registrations; (b) by establishing a trust fund to finance the foregoing, consisting of contributions monthly in amounts proportionate to each defendant's annual gross income; (c) by publicizing and making known to plaintiffs and others in like position the foregoing program.

Under these allegations, liberally construed, the respondents are entitled to prove that the real *intent* of the conspirators was not to invoke the processes of the administrative agencies and courts, but to discourage and ultimately to prevent the respondents from invoking those processes. Such an intent would make the conspiracy "an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Eastern Railroad Conference* v. *Noerr Motor Freight,* 365 U. S., at 144.

It is only on this basis that I concur in the judgment of the Court.