**WESTMAC, INC., a Michigan corporation, Plaintiff-Appellant,**

**v.**

**Lon SMITH; Individually; Smith Bros. Velte & Co., a Michigan corporation; Smith Bros. Velte & Company, d/b/a Sunfield Farmers Elevator Co.; Bert Post, Ind., Minor Walton Bean Co., a Michigan corporation; Frank E. Bowles, Ind.; Potterville Elevator Co.; Mid-Michigan Farm & Grain Assc., Inc., and all members, stockholders and officers of Mid-Michigan Farm & Grain Association, Inc., Ind., Defendants-Appellees.**

**No. 85–1475.**

United States Court of Appeals, Sixth Circuit.

Argued March 7, 1986.

Decided July 30, 1986.

Rehearing and Rehearing En Banc Denied Sept. 18, 1986.

**314**

Gary P. Schnek, Dan E. Bylenga, Jr., Gregory G. Prasher (argued), Schenk, Boncher & Prasher, Grand Rapids, Mich., for plaintiff-appellant.

Frederick M. Baker, Jr. (argued), Honigman, Miller, Schwartz & Cohn, Richard A. Gilford, Lansing, Mich., Douglas R. Inglis, Charlotte, Mich., for defendants-appellees.

Before MERRITT and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

WELLFORD, Circuit Judge.

Plaintiff, Westmac, Inc., has sued the defendants charging antitrust violations. The focus of this appeal concerns defendants' opposition to plaintiff's effort to obtain special tax benefit bond financing of a grain elevator facility in Clinton County, Michigan.[1] Plaintiff appeals from a grant of summary judgment to defendants based on a claimed exemption from plaintiff's antitrust claim known as the *Noerr-Pennington* doctrine. Plaintiff charged defendants with pursuing and conducting lobbying and litigation activities for the express purpose of forcing plaintiff to join an anticompetitive price maintenance conspiracy or, if that failed, to damage plaintiff economically by reducing or destroying its ability to compete. The district court held no genuine issue of material fact existed respecting whether defendants' lobbying and litigation activities were "a genuine attempt to influence official decision making" protected by the *Noerr-Pennington* doctrine. We affirm.

**I.**

In 1974 the state legislature of Michigan enacted the Economic Development Corporations Act. Mich.Comp.Laws Ann. § 125.-1601–125.1636. The statute permits munic-

---

1. By stipulation, plaintiff conceded that its "remaining and State law based claims" brought about no "economic damages" beyond the "inception of litigation by the defendant[s]," which is the subject matter of the appeal.

ipalities to form local Economic Development Corporations (EDCs) for the purpose of issuing revenue bonds. The proceeds are used for the construction of privately owned and operated businesses. In February 1981 Westmac approached the Clinton County Economic Development Corporation in order to obtain EDC bonding to assist in the financing of construction of a high speed grain elevator and railroad loading facility in that county. Westmac obtained initial approval of the project by the Clinton County EDC on February 26, 1981.

On April 3, 1981, defendant Lon Smith wrote other grain elevator operators in the area and urged them to communicate their concerns about the method of financing the new grain terminal to the Clinton County officials and to attend and voice their concerns at public hearings. On May 20, 1981, the Mid-Michigan Farm and Grain Association was established for the stated purpose of promoting the economic welfare and stability of the agricultural industries of Central Michigan. The Clinton County EDC gave final approval of Westmac's project on July 28, 1981. Westmac proceeded to arrange for issuance of the tax benefit bonds.

On August 5, 1981, Mid-Michigan filed suit against the Clinton County EDC in the Clinton County Circuit Court, challenging the constitutionality of the EDC Act. Westmac intervened in that suit as a party defendant. The court upheld the constitutionality of the statute. *Mid-Michigan Farm & Grain Association, Inc. v. Henning,* No. 81–3038–AN (Clinton Co.Cir.Ct. Dec. 10, 1981). The Michigan Court of Appeals affirmed. *Mid-Michigan Farm & Grain Association, Inc. v. Henning,* 127 Mich.App. 735, 339 N.W.2d 243 (1983). Plaintiff filed its antitrust complaint in the district court on December 30, 1981.

## II.

Under the *Noerr-Pennington* doctrine, genuine attempts to influence passage or enforcement of laws are immune from antitrust scrutiny, regardless of the anticompetitive purpose behind such attempts. *United Mine Workers v. Pennington,* 381 U.S. 657, 669–71, 85 S.Ct. 1585, 1592–94, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137–39, 81 S.Ct. 523, 529–30, 5 L.Ed.2d 464 (1961). As the Court stated in *Pennington:*

> The legality of the conduct [in *Noerr*] "was not at all affected by any anticompetitive purpose it may have had," ... [365 U.S.] at 140 [81 S.Ct. at 531]—even though the "sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors ...," *id.,* at 138 [81 S.Ct. at 530]. Nothing could be clearer from the Court's opinion than that anticompetitive purpose did not illegalize the conduct there involved.

381 U.S. at 669, 85 S.Ct. at 1593. The right to petition, upon which the doctrine is based, *see Noerr,* 365 U.S. at 138, 81 S.Ct. at 530,[2] extends to all departments of government, and therefore governs the access of citizens to courts and administrative agencies. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972).

On the other hand, the *Noerr-Pennington* doctrine does not protect against improper attempts to influence the government or the courts that are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *California Motor Transport,* 404 U.S. at 511, 92 S.Ct. at 612 (quoting *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533). In *California Motor Transport* the respondents sued petitioners on the grounds they conspired to monopolize trade and commerce in the trucking industry in violation of the anti-

---

**2.** The conduct in *Noerr* concerned an alleged conspiracy to monopolize and restrain trade in the long-distance freight business in violation of sections 1 and 2 of the Sherman Act. The truckers alleged that the railroads sought to achieve their illegal goals by conducting a publicity campaign against truckers designed to destroy them. 365 U.S. at 129, 81 S.Ct. at 525.

trust laws. The respondents alleged petitioners conspired to institute repeated state and federal proceedings to defeat respondents' applications to acquire operating rights or to transfer or register those rights. *Id.* 404 U.S. at 509, 92 S.Ct. at 611 . The respondents' sham theory in *California Motor Transport* was that petitioners on a number of occasions used their resources to harass and deter respondents in their access to administrative and judicial proceedings. The Court distinguished petitioners' activity from the activity in *Noerr*. *Id.* at 508, 92 S.Ct. at 609. In *Pennington* the Court had stated that *"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." 381 U.S. at 670, 85 S.Ct. at 1593. The *California Transport Motor* Court contrasted attempts to influence public officials from repeated efforts to block competitors from access to adjudicating tribunals, as allegedly occurred in *California Motor Transport. Id.* 404 U.S. at 511–12, 92 S.Ct. at 612. In this latter situation the Justices endorsed examining the purpose or intent of the alleged anticompetitive activities. *Id.*[3] The Court reiterated that when the exercise of first amendment rights is an integral part of conduct that violates a valid statute or constitutes an abuse of process it is not immunized from regulation. *Id.* at 514–15, 92 S.Ct. at 613–14. The Court elaborated that "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils.' " *Id.* at 515, 92 S.Ct. at 614 (citation omitted).

Subsequent cases have attempted to clarify the scope of the sham exception to the *Noerr-Pennington* doctrine. In *Winterland Concessions Co. v. Trela,* 735 F.2d 257, 263 (7th Cir.1984), the plaintiff alleged that defendant employed various tactics to deny plaintiff a judicial determination or

definition of defendant's property rights. The court, in attempting to define the parameters of the sham exception, noted that litigation may be used for improper purposes, such as suppressing competition. The panel defined sham litigation as litigation filed by an individual *solely* to harass and not to win a favorable judgment. *Id.* (quoting *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466, 472 (7th Cir. 1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983)). The court carefully distinguished between an anticompetitive purpose, which the *Noerr* doctrine does protect, and the purpose to harm competitors "not by the *result* of the litigation, but by the simple fact of the *institution* of the litigation." *Id.* at 264 (quoting *Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1265–66 (S.D.Fla.1980)). Since plaintiff alleged defendant's purpose was to eliminate plaintiff and not to obtain a judgment, the court reversed the district court's dismissal of plaintiff's antitrust claim.

In *Omni Resource Development Corp. v. Conoco, Inc.,* 739 F.2d 1412 (9th Cir. 1984), the defendant successfully obtained a preliminary injunction against plaintiff in a state trespass suit. *Id.* at 1413. The plaintiff alleged that defendant used false and fraudulent affidavits in the suit in a scheme to restrain trade. The court assumed this activity was at least tortious under state law, but nevertheless determined it to be protected under the first amendment unless "undertaken solely to interfere with free competition and without the legitimate expectation that such efforts will in fact induce lawful government action." *Id.* at 1413 (citing *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533). The Ninth Circuit further noted that when the antitrust activity concerns only a single baseless suit,[4]

3. The Court noted that although unethical conduct was insufficient to satisfy the sham exception in *Noerr* when the conspiracy concerned lobbying activities, it can be sufficient when the conspiracy concerns use of adjudicatory processes. 404 U.S. at 512, 92 S.Ct. at 612. The Court gave as an example of unethical conduct such activities as perjury, fraud, conspiracy,

bribery, misrepresentations, a pattern of baseless, repetitive claims, or other kinds of abuse of process. *Id.* at 512–13, 92 S.Ct. at 612–13.

4. Plaintiff urges this court to resolve the question whether the sham exception requires more than one baseless suit. *See Cleveland v. Cleveland Electric Illuminating Co.,* 734 F.2d 1157,

rather than a pattern of repeated filings, the sham exception does not apply unless the baseless suit has other characteristics of grave abuse. *Id.* at 1414.[5] The court affirmed the trial court's judgment on the pleadings in favor of defendants.[6] *See also Cleveland v. Cleveland Electric Illuminating,* 734 F.2d 1157 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

In the recent case of *Razorback Ready Mix Concrete Co. v. Weaver,* 761 F.2d 484 (8th Cir.1985), the court reversed the district court's order denying defendant's motion to grant summary judgment because the panel found that the *Noerr-Pennington* doctrine protected defendant's conduct. Defendants had opposed a bond issue, the proceeds from which plaintiff sought to pay its corporate debt. The sale of the plaintiff's business was contingent on the bond issue. *Id.* at 486. Defendants unsuccessfully lobbied against the bond issue with local officials. They subsequently filed a suit and later perfected an appeal in state court challenging the propriety of the bond issue. *Id.* As an alleged result of defendants' actions, the bonds were not issued and plaintiff went into bankruptcy. *Id.* The court held the sham exception was inapplicable as a matter of law, concluding that the key to the sham exception is "an improper interference with governmental processes." *Id.* at 487. It suggested the "improper interference" to which it referred is "illegal reprehensible practices such as perjury, fraud, conspiracy with or bribery of governmental decision makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process." [7] *Id.* (quoting *Chest Hill Co. v. Gluttman,*

1981–2 Trade Cas. (CCH) ¶ 64,417 (S.D.Ohio May 29, 1981)); *see also Energy Conservation, Inc. v. Heliodyne, Inc.,* 698 F.2d 386, 388 (9th Cir.1983) ("[T]he application of the antitrust laws need not be waived when the bringing of a suit is *solely* an effort to interfere directly with a competitor.") (emphasis added); *Alexander v. National Farmers Organization,* 687 F.2d 1173, 1195 (8th Cir.1982) ("The sham exception generally involves governmental contacts which are not a genuine attempt to influence official decision making, but instead are *merely* an attempt to interfere directly with the business relationships of a competitor.") (emphasis added), *cert. denied,* 461 U.S. 937, 103 S.Ct. 2108, 77 L.Ed.2d 313 (1983); *Associated Container Transp. (Australia) Ltd. v. United States,* 705 F.2d 53, 58 (2d Cir.1983) ("The *Noerr-Pennington* doctrine ... does not ... shield those who attempt to abuse the governmental process for the purpose of injuring a competitor.").

### III.

We find persuasive the reasoning in *Razorback* that states the sham exception does not apply merely because a party files a suit with the principle purpose of harming his competitor. The first amendment, as expressed in the *Noerr-Pennington* doctrine, protects even strongly expressed anticompetitive sentiments. At the same time, we are cognizant that the Supreme Court ruled in *California Motor Transport* that intent is relevant when a party allegedly filed a suit without concern for obtaining a favorable judgment, but only directly to harm a competitor. As the Fifth Circuit recently stated:

ing of the suit, was the cause of plaintiff's harm. 739 F.2d at 1414.

**7.** Some language in *Razorback* arguably suggests that a party's motive in bringing a suit is never relevant. *See* 761 F.2d at 488 ("Defendants' motive may have been selfish or altruistic or mixed; that is immaterial. Regardless of motive, defendants' actions are clearly within the ambit of First Amendment protection....."). *But see California Motor Transport,* 404 U.S. at 511–12, 92 S.Ct. at 612.

---

**5.** One example of grave abuse is litigation that is an integral part of a larger antitrust conspiracy. 739 F.2d at 1415.

**6.** The court emphasized that the judgment resulting from defendant's suit, not the mere fil-

1162–63 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). But in view of our agreement with the district court's determination that defendant's state suit was not baseless, the issue is not before the court.

The problem stems in part from the fact that determining whether the petitioning conduct was a sham often involves questions of motive or subjective intent. For example, the conduct protected by the Court in *Noerr* was an advertising campaign by the railroads directed against the trucking industry and intended to persuade the state legislature to enact laws detrimental to truckers. If the ad campaign had been instituted for the purpose of injuring the trucking industry directly, rather than in an effort to persuade the legislature to take action, the activity would have been a sham. Similarly, if a competitor instituted an action against his rival before a regulatory agency in order to force him to defend against the action rather than in hopes of a favorable agency ruling, the activity would not be bona fide petitioning conduct. Developing criteria to separate legitimate efforts from others is not simple. *See generally* P. Areeda, *Antitrust Law* ¶ 203 (1982 Supp.).

*Greenwood Utilities Commission v. Mississippi Power Co.,* 751 F.2d 1484, 1498 n. 9 (5th Cir.1985).

We also agree with the rationale of *Razorback* that the sham exception is a "narrow one" and "is applicable when the activity in question corrupts governmental processes to such an extent that it constitutes access barring conduct of the sort described in *California Motor*." 761 F.2d at 487 (citing *Woods Exploration & Producing Company v. Aluminum Company of America,* 438 F.2d 1286, 1296–98 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972)). We further agree with that court's reasoning that "the key to the 'sham exception' is an improper interference with governmental process." *Id.* at 487.[8]

■ Determining whether a party who filed suit was indifferent to obtaining a favorable judgment may often be a diffi-cult question of fact. *Accord Grip-Pak,* 694 F.2d at 472. We hold that when a lawsuit raises a legal issue of genuine substance, it raises a rebuttable presumption that it is a serious attempt to obtain a judgment on the merits instead of a mere sham or harassment. The first amendment interests concerned and the case law discussed earlier support placing the evidentiary burden on the antitrust plaintiff to prove that the action of the defendant comes within the sham exception to *Noerr-Pennington* in this kind of case.

## IV.

■ Application of these principles to the facts of this case suggest that the defendants' activities in pursuing the lawsuit do not fit within the sham exception. The district court emphasized that the Michigan courts did not treat defendants' suit as without merit or a mere sham. The state court referred to the suit as a "fundamental and well articulated challenge to the constitutional validity of the Economic Development Corporations Act." On these essentially undisputed facts we find defendants' state suit to have raised a substantial issue of state law. We may therefore presume that defendants filed the suit as a genuine attempt to obtain a judgment on the merits, even if they also intended to prevent plaintiff from obtaining a tax and economic benefit as a potential competitor.

■ Plaintiff has not rebutted this presumption. Plaintiff principally bases its argument that the sham exception applies on a memorandum written by one defendant that states in part: "If this [lobbying activity] doesn't succeed, start a lawsuit-bonds won't sell." The memorandum to this defendant's lawyer also pointed out that a "requirement" of the EDC was to serve the "public purpose" and that this needed to be "our focus." It emphasized "we need local support," and that the act was "unconstitutional-no equal protection of law," and it

**8.** *Razorback's* facts are in many ways analogous to those in this case. A group of competitors in *Razorback* opposed the bond issue for a competitor. When the county judge approved the bond issue, they challenged this action in court, alleging that the bond issue violated the Arkansas constitution. They lost in the trial court and appealed.

directed that the attorney "start legal action when county commissioners give approval."

Although this statement may support plaintiff's theory of defendants' anticompetitive animus, it does not alter the protected nature of their litigation activities. This memo does memorialize a series of efforts to prevent plaintiff from selling the bonds. The memo suggests that if these efforts did not succeed, then the defendants should institute a lawsuit challenging the constitutionality of the bonds. But we agree with the district court's view that the memo does not raise a sufficient fact issue regarding the intent of defendants to preclude granting them summary judgment.[9]

The district court took full account of this court's admonition in *Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.*, 560 F.2d 211, 213 (6th Cir.1977) (per curiam): "[S]ummary judgment is rarely an appropriate response to antitrust litigation, since such litigation so frequently turns upon disputed issues of fact." It properly also noted, however, that summary judgment is available in proper circumstances in antitrust cases when there are no disputed material facts, or if the issue presented is clearly a question of law. *Id; see also Razorback Ready Mix Concrete v. Weaver*, 761 F.2d 484 (8th Cir.1985); *Comet Mechanical Contractors, Inc. v. E.A. Cowen Construction, Inc.*, 609 F.2d 404, 405 (10th Cir.1980). Here the parties have pursued discovery and the facts are clear regarding the circumstances of the filing of the suit and that the state courts considered the suit to present substantial issues, even though defendants were not ultimately successful. This court has approved granting of summary judgment concerning antitrust claims under such circumstances. *See Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 947–48 (6th Cir.1983).[10]

We find that granting of summary judgment in this case was not error. We assume that defendants' purpose "was either to stop or delay sale of the EDC bonds or prevent the EDC financing" as asserted by plaintiff. But plaintiff concedes that the "Clinton County Circuit Court Judge did not treat the [defendants'] case as a 'sham.' "[11] Instead the state court viewed

---

9. It defies common sense to suggest defendants did not seek a favorable judgment. A favorable judgment declaring the state law unconstitutional would have prevented the sale of the bonds, which was defendants' allegedly anticompetitive purpose. The record on appeal does not suggest that this is a case in which "... the stakes, discounted by the probability of winning, would be too low to repay the investment in litigation." *Grip-Pak*, 694 F.2d at 472 (Judge Posner discussing examples of when the stakes would suggest defendant's purpose was not to obtain a favorable judgment).

Other circumstances indicate that the state court action was not a sham or in any way an abuse of the judicial process. Defendants promptly stipulated that plaintiff might intervene. There was also a further agreement providing that the Michigan court give expedited consideration to the defendants' suit challenging the constitutionality of the Michigan law authorizing the EDC. These arrangements indicate that the defendants' state suit was not an effort to defeat plaintiff's EDC petition by delay, harassment, or any kind of "reprehensible practice."

10. We do not consider the conversation between plaintiff's president and Bowles, a former member of the Mid-Michigan Farm and Grain Asso-

ciation, that upon certain conditions the latter "believed" or "felt" that he might get the group to drop its appeal and effect a settlement to be a material circumstance precluding a grant of summary judgment. In granting summary judgment the district court gave plaintiff's contentions the benefit of the doubt. It assumed an "attempt to influence official decision making" and "anti-competitive purpose" on the part of defendants, but it held this behavior to be protected and exempted from antitrust claims because defendants' actions, particularly in bringing about the constitutional challenge in court, were not an "abuse of governmental processes," nor "unlawful lobbying activities," nor "sham" litigation. The district court held that to come within the sham exception to the *Noerr-Pennington* doctrine, which protects the important first amendment right of petition, the legal action must be shown to be "baseless, initiated without probable cause, or tainted by fraud, perjury, bribery, or other practices constituting a corruption of the judicial process."

11. We acknowledge, however, plaintiff's contention that evidence which "supports" its sham theory was not before the state judge, but the contention was considered by the district court, which concluded: "[p]laintiffs in the present

the case as raising an important legal question. The substance of the defendants' state case raises a rebuttable presumption that their lawsuit was a genuine attempt to obtain a favorable judgment.[12] Plaintiff does not allege facts that can rebut this presumption.

Accordingly, we AFFIRM the district court's grant of summary judgment.

MERRITT, Circuit Judge, dissenting.

In 1961 Justice Black wrote "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961). Since then the federal courts have struggled to give specific meaning to the *Noerr-Pennington* doctrine's sham exception. We need a definition of the sham exception that is clear and analytically sound as well as functional.

I do not take issue with the Court's general view of the *Noerr-Pennington* sham exception-that when an antitrust plaintiff claims his defendants conspired to restrain trade by filing a sham suit against a competitor, application of the sham exception turns on whether the defendants genuinely sought a favorable judgment in their action or were seeking to inflict antitrust injury on a competitor by the litigation process itself, regardless of the suit's outcome. I do not agree, however, with the rule that the existence of an "issue of substance" or "colorable claim" should be held to create a constitutional presumption-rebuttable or irrebuttable-of no judicial abuse of process, and hence no sham. In this dissent I would make the same point that the Seventh Circuit made in *Grip-Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466 (7th Cir.1982), cert. denied, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983). The Court held that if lawsuits raising colorable claims

> were immunized from government regulation by the First Amendment, the tort of abuse of process would be unconstitutional-something that, so far as we know, no one believes. The difference between abuse of process and malicious prosecution is that the former does not require proving that the lawsuit was brought without probable cause. If abuse of process is not constitutionally protected, no more should litigation that has an improper anticompetitive purpose be protected, even though the plaintiff has a colorable claim.

> . . . .

> ... The existence of a tort of abuse process shows that it has long been thought that litigation could be used for

---

case present no facts to support an inference that the defendants abused the judicial process...."

**12.** The dissent implies that by creating the presumption in the present case we are immunizing from government regulation the challenged conduct, which concededly may have an anticompetitive effect. But we have not "immunized" defendants' conduct in the present case because we have afforded the plaintiff an opportunity to demonstrate that defendants' state court suit was something other than a serious challenge to the validity of the state law relied upon by plaintiff to obtain a special tax benefit. The dissent asserts that we should determine whether the defendant's action and motivation in bringing the state court challenge amounted to an "abuse of process." See *Grip-Pak,* 694 F.2d at 471–72. We do not disagree that if

plaintiff could establish that defendants' actions constitute the tort of abuse of process, in the sense that defendants' suit corrupted or improperly interferred with the judicial process, that the sham exception does apply. See *Razorback,* 761 F.2d at 487; *Assoc. Container Transp.,* 705 F.2d at 59 (states that "abuses of the governmental process" such as "misrepresentations" or "a pattern of baseless repetitive claims may induce antitrust liability"). We merely are creating an evidentiary presumption to facilitate the applicability of the sham exception. We would also agree with the dissent's acknowlegement that defendants probably would admit that they filed their state court action with an intent to impede or damage plaintiff's effort to construct a competing grain elevator aided by special statutory benefits, and that such intent is insufficient as a matter of law to take this action out of the protection of the *Noerr-Pennington* doctrine. See dissent at n. 4.

improper purposes even when there is probable cause for the litigation; and if the improper purpose is to use litigation as a tool for suppressing competition in its antitrust sense, it becomes a matter of antitrust concern.[1]

694 F.2d at 471–72 (citations omitted).

Rather than relying on the panel's presumption rule in defining a sham, I would use the elements of the tort of abuse of process, as defined by Dean Prosser:

> The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

W. Prosser, Handbook of the Law of Torts § 121 at 857 (4th ed.1971). The Restatement of Torts capsulizes abuse of process as follows:

> One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process.

Restatement (Second) of Torts § 682 (1977).[2]

A commentator has explained the use of the elements of the tort of abuse of process in defining *Noerr-Pennington's* sham exception:

The gravamen of the tort of abuse of process is the initiation or instigation of a legal proceeding against an individual to secure an objective other than the judgment ostensibly sought in that proceeding. The ability to maintain the action does not depend either on the absence of probable cause for the initial proceeding or on its termination in favor of the abuse of process plaintiff. However, the plaintiff must show that the defendant instituted the litigation with the purpose of achieving a "collateral" objective, and that he committed a specific act-other than those acts incidental to the normal use of the court or agency-directed at attaining that objective. A paradigmatic case of abuse of process is the initiation of a lawsuit against the abuse of process plaintiff to compel him to pay a debt not the subject of the complaint (the collateral purpose) and an express offer to terminate or abstain from litigation if the plaintiff pays the debt (the specific act). Abuse of process rests on the theory that no legitimate social interest is served by allowing the employment of even meritorious litigation by the defendant when his real aim is the nonadjudicatory objective, *and* when proof of specific conduct taken to achieve that objective limits the dangers of inquiry into his subjective purpose.

There are analogous situations in which litigation, even if instituted with probable cause, could be used to achieve specifically evidenced anticompetitive ends collateral to the ostensible purpose of the litigation, and in which antitrust sanctions would be warranted. For example, party *A* and party *B* could con-

---

**1.** This analysis was criticized by Handler & De Sevo, *The* Noerr *Doctrine and its Sham Exception,* 6 Cardozo L.Rev. 1, 33–40 (1984), but the result it reached was accepted by Kintner & Bauer, *Antitrust Exemptions for Private Requests for Governmental Action: A Critical Analysis of the* Noerr-Pennington *Doctrine,* 17 U.C.D. L.Rev. 549, 575–76 (1984).

**2.** Although this section of the Restatement does not expressly require an improper affirmative act in furtherance of the illegitimate purpose (as does Dean Prosser), the comments and illustrations make clear that such an act is required:

> *A* is a dangerously insane person. *B,* her son, instigates lunacy proceedings against her, seeking to have her confined for the protection of herself and others. His motive in doing so is to succeed to the control of her property after she is committed. This is not abuse of process.

Restatement (Second) of Torts § 682 illustration 4.

spire to threaten litigation against party *C*, and could expressly offer to forego the litigation if *C*, an active competitor, participated in a price-fixing scheme or abandoned an aggresive advertising campaign.

Note, *Limiting the Antitrust Immunity for Concerted Attempts to Influence Courts and Adjudicatory Agencies: Analogies to Malicious Prosecution and Abuse of Process*, 86 Harv.L.Rev. 715, 732–33 (1973) (emphasis in original); *see also Chest Hill Co. v. Guttman*, 1981–82 Trade Cases (CCH) ¶ 64,417 at 75,057–59 (S.D. Ohio May 29, 1981); *Associated Radio Service Co. v. Page Airways, Inc.*, 414 F.Supp. 1088, 1096 (N.D.Tex.1976).

Under this analogy, if the defendants initiated their state court action with the primary[3] purpose of achieving some anticompetitive result collateral to the ostensible purpose of the litigation and, in furtherance of that collateral purpose, committed some act not normally incident to litigating such an action, defendants' actions amounted to sham litigation and are not protected from liability by the *Noerr-Pennington* doctrine.

This way of defining the sham exception accords with what we know about the litigation process. As lawyers we know that it is not uncommon for parties to commercial litigation (even some who win) to be motivated to file their actions, not by the prospect of winning, but by the harassment value of the litigation. If the defendants possess a claim with a reasonable basis but the antitrust plaintiff can show that the defendants were using the litigation process itself as a weapon, the court should rule that the defendants' use of the process was a sham and was not genuine petitioning for redress of grievances-assuming a specific overt act of the type described above. Again, assuming an overt act, this definition would exclude from *Noerr-Pennington's* protection the case of a group of defendants who conspire to bring a colorable claim against a competitor, but who leave a paper trail showing that they did not know of or care about the suit's basis in the law and that they expected that the competitor would be driven out of the market by factors related to the litigation process itself-cost, delay, damage to reputation, decreased sales, etc.—long before any judgment in the action is rendered.

Applying this definition to this case, I believe that the plaintiff has alleged sufficient facts to support the conclusion that defendants were attempting to use the litigation process, as opposed to the judgment sought in the suit, as a weapon against plaintiff.[4] Plaintiff discovered a memo from one of the defendants to his lawyer stating: "If this [lobbying activity] doesn't succeed, *start a lawsuit-bonds won't sell.*" (Emphasis added.) Another memo stated: "A letter I wrote to area elevator in August 1981 pleading for more contributions has two inflammatory references to [ (*if nothing else, we'll delay sale of the bonds*)]." (Emphasis added.) Plaintiff asserts that one of defendants' "sham purposes" behind filing the action was to coerce plaintiff into joining defendants' price fixing conspiracy. Plaintiff alleges that before defendants filed their action, one of the defendants met with the plaintiff's principal and asked him to implement certain "standard charges" at plaintiff's proposed elevator in order to obtain "uniformity in certain charges." Further, plaintiff alleges that while the appeal in defendants' state court action was pending, one of the defendants told plaintiff's representatives that if plaintiff would agree to implement a certain guaranteed system of prices to protect de-

---

**3.** *See* Restatement (Second) of Torts § 682 comment b.

**4.** Plaintiff's briefs assert that defendants filed their action with the intent to damage plaintiff's efforts to construct a grain elevator that would compete with defendants' elevators. Indeed, defendants would probably admit that this was their intent. However, as discussed by Judge Wellford above, this intent does not (contrary to plaintiff's position) make a sham out of defendants' lawsuit. Nevertheless, even though plaintiff was laboring under a mistaken view of the sham exception, plaintiff managed to bring forward enough facts to rebut the panel's presumption.

fendants' prices in the market, defendants would drop their appeal.

Thus, in short, plaintiff alleges that defendants were motivated to file their action primarily by the collateral anticompetitive purposes of forcing plaintiff to join a price fixing scheme and destroying the marketability of the EDC bonds. Plaintiff further alleges that at least one defendant committed the overt act of stating, in effect, that defendants' action would be terminated if plaintiff joined defendants' price fixing arrangement. Thus, according to plaintiff's allegations, defendants possessed the requisite collateral purpose and committed an affirmative act in furtherance of that purpose. Such facts, if proven, require that defendants' state court action be held to be a sham.

This case was originally decided by the District Court under an erroneous definition of the sham exception. Therefore, rather than attempting to determine from the record and argument whether defendants' purpose and actions do indeed come within the sham exception, as properly defined, I would reverse the District Court's judgment and remand for reconsideration in light of the discussion above.