**AURORA CABLE COMMUNICATIONS, INC., a Michigan Corporation, Plaintiff,**

v.

**JONES INTERCABLE, INC., a Colorado Corporation; Cable TV Fund 12–BCD Venture, a Colorado Partnership consisting of limited partnerships; and Tribune Cable Communications, Inc., d/b/a Tribune Cablevision Company, a Delaware Corporation, Defendants.**

No. M87–183–CA2.

United States District Court, W.D. Michigan, S.D.

April 26, 1989.

John M. McCarthy, Hancock, Mich., and Omer Rains, Sacramento, Cal., for plaintiff.

David J. Saylor, Washington, D.C., and Paul M. Marin, Marquette, Mich., for defendants.

## OPINION

ROBERT HOLMES BELL, District Judge.

Tribune Company, Inc., successor in interest to defendant Tribune Cable Communications, Inc. ("Tribune") and Jones Intercable, Inc., and Cable TV Fund 12–BCD Venture, ("Jones") moves for partial summary judgment on the four counts of Aurora's complaint.

## BACKGROUND

Aurora brought this action after it failed to successfully establish a second, "overbuild," cable television system in the cities of Houghton and Hancock intending to compete with Tribune. Tribune had served the area for about twenty years and it is contended its technology had become out-of-date. In 1985 Tribune decided to sell its extensive national cable television business. However, Tribune later decided to competitively upgrade its equipment and then sell the operation to Jones on April 29, 1986.

It is alleged Aurora apparently believed that by acting fast, using modern technology, and offering greater service it could compete effectively with Tribune and establish itself in the market before Tribune completed its upgrade. To accomplish this Aurora had to obtain the requisite franchises, utility pole licenses, construct its delivery system, and solicit customers. Tribune rapidly upgraded the system before April 29, 1986. Aurora began building its system in March 1986 and first delivered service during July of 1986. Aurora's entry into the market was apparently too late to successfully compete with the upgraded and established Jones–Tribune cable service. The failed Aurora sold its interests to CableAmerica in August 1986. Tribune Cablevision was liquidated into Tribune Company, its parent. Bresnan Communications (a nonparty to this suit) bought Tribune and Aurora in 1987.

Aurora asserts that it had a limited window of opportunity to establish itself in the Houghton–Hancock market before Jones and Tribune upgraded their system and alleges that Jones and Tribune conspired in various ways to delay the franchising and construction of Aurora's cable system in order to shut them out of the market.

Specifically Aurora claims that Tribune and Jones conspired to delay the issuance of Aurora's franchises from the cities by opposing Aurora's application. Further, Tribune had Aurora's construction crew arrested and prosecuted for trespass when Aurora's workers moved Tribune's cables on the utility poles. Also, Tribune and Jones conspired with the local utility com-

panies to have Aurora's construction delayed and its cost increased by insisting on certain installation regulations. Aurora also alleges that Tribune and Jones acted in other ways to delay Aurora's construction of its system.

Aurora also alleges the defendants engaged in predatory pricing and interference with its program supply. However, Tribune's motion[1] does not address these issues because Tribune believes that it has no liability on these claims since it had sold all of its interest in the operation to Jones by the time of this alleged conduct.

Aurora's complaint consists of four counts: (1) unlawful contract, combination, or conspiracy to restrain trade violating Section 1 of the Sherman Act, 15 U.S.C. § 1, (2) unlawful attempt to monopolize or unlawful retention of monopoly violating Section 2 of the Sherman Act, 15 U.S.C. § 2, (3) violation of Michigan's antitrust statute, M.C.L. §§ 445.771 *et seq.*, and (4) tortious interference with Aurora's expectancy of a valid business relationship with prospective cable subscribers.

For purposes of presenting this motion Tribune and Jones do not contest Aurora's claim that they disparaged Aurora's applications, made misrepresentations to city franchising officials, and requested prosecution of Aurora's construction crew for trespass. Nevertheless, Tribune and Jones argue that summary judgment is proper under the *Noerr–Pennington* doctrine.

■ Essentially the *Noerr–Pennington* doctrine holds that the Sherman Act does not apply to individual or concerted activity to influence *governmental action* which may restrain trade or create monopolies. This political action exception is constitutionally based on the right to *associate* and to *petition* government. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626

(1965); *Potters Medical Center v. City Hospital Association,* 800 F.2d 568, 579 (6th Cir.1986); *Lamb Enterprises, Inc. v. Toledo Blade Co.,* 461 F.2d 506, 516 (6th Cir.) *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972).

The *Noerr–Pennington* right to petition exists regardless of hostile or anticompetitive intent or purpose to eliminate competition. Further, misrepresentation in the *political* arena, as distinct from the judicial arena, is outside the scope of the Sherman Act. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972); *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) (Aurora reads to apply "in whatever forum"); *Westmac, Inc. v. Smith,* 797 F.2d 313, 318 (6th Cir. 1986); *accord Boone v. Redevelopment Agency of City of San Jose,* 841 F.2d 886 (9th Cir.1988) *cert. denied —* U.S. *—,* 109 S.Ct. 489, 102 L.Ed.2d 526.

■ A *sham* exemption exists to the *Noerr–Pennington* doctrine and applies to conduct *intended to injure a competitor but not to actually affect governmental action. California Motor Transport, supra.* In *California* the defendants did not actually intend to influence governmental action, but rather intended to intimidate smaller trucking competitors by the ominous prospect of expensive and protracted hearings before administrative bodies for operating rights. The Court reasoned that the *Noerr–Pennington* doctrine did not apply to conduct intended *"to bar ... competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process."* 404 U.S. at 512, 92 S.Ct. at 612. (emphasis supplied)

The Sixth circuit has recognized the sham exception as narrow and "applicable when the activity in question corrupts governmental processes to such an extent that it *constitutes access barring conduct* of the sort described in *California Motor." Westmac, supra.* (emphasis supplied)

---

1. Tribune originally filed this motion alone. Jones later joined in the motion adopting the

arguments as presented by Tribune.

Even assuming that Tribune's and Jones' motive was hostile and anticompetitive, it does not appear that Tribune and Jones engaged in any *access barring conduct* equivalent to that present in *California Motor, supra.* The Sixth Circuit, in *Westmac,* requires *access barring conduct.* Aurora admits that it had opportunity to communicate to the Houghton and Hancock officials about defendants' "misrepresentations." Although Aurora provides an affidavit of Michael A. White, CEO of Aurora, it is simply too conclusory to raise a material issue of fact. Even assuming an anticompetitive intent, no indication exists that Tribune and Jones did not intend to actually influence governmental action. No indication exists that Tribune and Jones barred Aurora's access to a governmental-adjudicatory tribunal. No access barring conduct as recognized in *California Motor* and *Westmac* exists in this case.

Aurora also claims that Tribune and Jones violated antitrust laws by having Aurora's construction crew arrested for trespass. Aurora admits that without permission it directed its construction crew to move Tribune's cable in order to install its own cable. Apparently Aurora was dissatisfied with the pace at which the current pole occupants were relocating the existing cables on the poles to accommodate Aurora's cables. Tribune requested Aurora to stop moving its cables several times. However, Aurora persisted. After Tribune filed a complaint, the police arrested three members of Aurora's construction crew for trespass.

Tribune and Jones argue that the rationale of the Noerr–Pennington doctrine also applies to its complaint of trespass against Aurora and the subsequent arrest of the construction crew. The police arrested the workers and the prosecutor brought the charges (which were later dropped in a settlement). In *Smith v. Combustion Engineering, Inc.,* 1988–2 [CCH] Trade Cas. Par. 68,224 at pp. 59, 447–78, 856 F.2d 196 (6th Cir.1988), the court afforded *Noerr–Pennington* immunity for informing police and testifying before a grand jury regarding competitor's suspected criminal behavior. In *Forro Precision, Inc. v. International Business Machines Corp.,* 673 F.2d 1045, 1059–61 (9th Cir.1982), the court reasoned that good faith request for valid police function is immune from antitrust liability notwithstanding anticompetitive intent. It appears that Tribune was merely doing what it had a legal right to do. The fact that the prosecutor, presumably exercising his independent prosecutorial discretion, actually brought charges confirms the fact the Tribune was merely exercising its legal right to solicit police protection for its property interest.

The foregoing analysis of Aurora's claims under the Sherman Act also applies to its claims under the Michigan Antitrust Reform Act, ("MARA") M.C.L. §§ 445.771 *et seq.* Under *Manufacturers Supply Co. v. Minnesota Mining & Manufacturing Co.,* 688 F.Supp. 303, 306 (W.D.Mich.1988), MARA parallels the Sherman Antitrust Act as it applies to intrastate conduct. Further, M.C.L. § 445.784(2) provides that courts should construe MARA as federal courts construe federal antitrust laws. Thus, insofar as the *Noerr–Pennington* doctrine indicates that summary judgment is appropriate on Aurora's claims under the Sherman Act, summary judgment is also appropriate under MARA.

Similarly, Aurora's state claim of tortious interference with a business expectancy based on Tribune's and Jones' "petitioning" government should be dismissed under the First Amendment component of the *Noerr–Pennington* doctrine. *Trepel v. Pontiac Osteopathic Hospital,* 135 Mich.App. 361, 354 N.W.2d 341 (1984).

Aurora also claims that Tribune and Jones and the utilities (telephone and power) *conspired* to delay Aurora's construction of its cable delivery system. A conspiracy is a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). Specifically Aurora alleges that Tribune and Jones and the utilities conspi-

ratorially required Aurora to install its cable 12 inches above Tribune's cable on the same side of the pole, insisting on a lowest line clearance of 14 feet, not allowing Aurora to use "Illinois" brackets, and requiring Aurora to pay for pole "changeouts" where Aurora's new pole occupancy required taller poles.

■ Under *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), itself an antitrust case, mere allegations about intent and motive are insufficient to withstand a motion for summary judgment. Plaintiff must set forth specific facts showing that there is a genuine issue for trial. *Miller Insituform, Inc. v. Insituform of North America, Inc.*, 830 F.2d 606, 609 (6th Cir.1987), *cert. denied*, — U.S. — , 108 S.Ct. 1023, 98 L.Ed.2d 988 (1988). Further, under *Matsushita* "antitrust law limits the range of permissible inferences from ambiguous evidence in a [Sherman Act] § 1 case." *Matsushita*, 106 S.Ct. at 1357. Mere association or opportunity to conspire is insufficient for evidence of a conspiracy. *Bolt v. Halifax Hospital Medical Center*, 851 F.2d 1273, 1286 (11th Cir.1988); *accord Tose v. First Pennsylvania Bank*, 648 F.2d 879, 894 (3rd Cir.1981). Moreover, plaintiff "must present evidence *'that tends to exclude the possibility'* that the alleged conspirators acted independently." *Id.* (emphasis added), *quoting Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. Additionally under *Matsushita* the "absence of any plausible motive ... is highly relevant to whether a 'genuine issue for trial' exists.... Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence." *Matsushita* 106 S.Ct. at 1361.

Tribune has supported its motion by indicating several factual bases on which the utilities *independently* insisted on the various disputed requirements to comply with national codes, observe industry safety practices, and to conform to general business practices.

Aurora has presented few specific facts in response. Michael White's deposition does suggest evidence of disparate treatment by the utilities of Tribune and Aurora, specifically as to relief from a particular 18 inch clearance requirement and certain National Electrical Safety Code ("NESC") requirements. However, Tribune represents, uncontestedly, that these variances were mere temporary accommodations incident to the upgrade and were subsequently and promptly rectified. These instances simply do not constitute a conspiracy.

Aurora also claims that Tribune unilaterally or in conspiracy with Jones unlawfully delayed the "make-ready" preparations of the poles by not promptly moving its cables to accommodate Aurora's cables on the poles. Tribune did not use its own employees to move its cables on the poles. Rather Tribune contracted with an outside crew to perform this work, explaining that its own limited work force (only two technicians) was needed to service current subscribers. Further, Tribune admits that it waited for a single outside crew to both reposition the cables on the poles and upgrade the delivery system at the same in order to reduce the total cost.

Aurora further argues the existence of a conspiracy in that, as provided in a Michigan Bell Manual, *all* pole occupants could have agreed, but did not, to relax a particular 12 inch clearance requirement for certain pole attachments, such as Aurora's cables. If all of the pole occupants had agreed, Aurora claims that it could have installed its cable without waiting for the protracted relocation of the other cables and operated successfully. Tribune, for one, did not agree to relax the 12 inch requirement and, thereby, effectively prevented any change of the 12 inch requirement to the minimum of 6 inches.

Tribune asserts that it insisted on a 12 inch clearance because of business and safety reasons to minimize potential wear due to cables rubbing in midspan, promote the safety of its linemen, and insure continuous uninterrupted service. Tribune argues that the order and pace of its "make ready" work reflected a valid business justification and therefore cannot be the basis of Sherman Act liability. *Times–Picayune*

*Publishing Co. v. United States,* 345 U.S. 594, 622, 627, 73 S.Ct. 872, 887, 890, 97 L.Ed. 1277 (1953); *Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 368–69 (9th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988) (legitimate business justification negates Sherman Act § 2 claim even if defendant has desire to maintain its market share); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 284 (2nd Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (monopolist does not violate Sherman Act § 2 if it has a valid business policy for refusing to deal in a particular way with its competitors).

 Aurora has not squarely responded to Tribune's and Jones' motion. The assertions in White's deposition are mainly conclusory restatements of the amended complaint. While the deposition suggests the possibility and opportunity for conspiratorial conduct, it does not allege factual support for its assertions. Further, Aurora does not present evidence which "tends to exclude the possibility of independent activity." Moreover, there is an absence of apparent motives to conspire. For example, a pole owning utility does not have a readily apparent motive to conspire with Tribune and Jones to restrain Aurora. Aurora would presumably be a revenue generating pole tenant for the utility pole owner. In the absence of plausible explanations and unambiguous factual support, summary judgment should be granted in favor of Tribune and Jones as to Aurora's claims of conspiracy.

Again, violation of MARA as to these conspiracy issues should be evaluated in a manner similar to the preceding Noerr–Pennington analysis. *Manufacturers Supply Co. v. Minnesota Mining & Manufacturing Co.,* 688 F.Supp. 303, 306 (W.D. Mich.1988); *Kerasotes Michigan Theatres, Inc. v. National Amusements, Inc.,* 658 F.Supp. 1514, 1522 (E.D.Mich.1987) *rev'd on other grounds,* 854 F.2d 135 (6th Cir. 1988). Accordingly, summary judgment should be granted in favor of Tribune and Jones as to Aurora's claims of conspiracy under MARA.

## CONCLUSION

In accordance with the foregoing analysis and application of the *Noerr–Pennington* doctrine this Court grants the motion of defendants Tribune and Jones for summary judgment on Aurora's claims under the Sherman Act, sections 1 and 2, under the Michigan Antitrust Reform Act, and for tortious interference with Aurora's expectancy of a valid business relationship.

The only issues that remain before this Court are Aurora's claims of predatory pricing and anticompetitive conduct with Aurora's signal and program supplier. This Court does not have these issues before it for resolution at this time.